Sagun TULI, M.D., Plaintiff,

v.

BRIGHAM & WOMEN'S HOSPITAL, INC., and Arthur Day, M.D., Defendants.

Civil Action No. 07cv12338–NG.

United States District Court, D. Massachusetts.

July 2, 2008.

William J. Dailey, Jr., John A. Donovan, III, Sloane & Walsh, LLP, Matthew Gry-gorcewicz, Robert Reid Hamel, Jr., Melick, Porter & Shea L.L.P., Boston, MA, for Defendants.

Rachel A. Lipton, Brown Rudnick, Margaret M. Pinkham, Elizabeth A. Ritvo, Brown Rudnick Berlack, Boston, MA, for Plaintiff.

### MEMORANDUM AND ORDER

### RE: MOTIONS FOR PRELIMINARY INJUNCTION

GERTNER, District Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* .................................................35

II. *BACKGROUND* ...............................................38
 A. *Dr. Tuli and Dr. Day* .................................38
 B. *Interactions with Dr. Whittemore* ..................41
 C. *Lead up to October Credentials Committee Meeting* ........43
 D. *October Meeting* ......................................44
 E. *Interim Period Between Credentials Committee Meetings* ........45
 F. *December Credentials Committee Meeting* ..............46

III. *DISCUSSION* .................................................46
 A. *Standard* ..............................................46
 B. *Likelihood of Success on the Merits* .................47
 1. *The McDonnell Douglas Framework* .............48
 2. *Price Waterhouse/42 U.S.C. § 2000e–2(m)* .........51
 3. *Retaliation* ......................................52
 C. *Applying the Law to the Facts* .....................53
 D. *Irreparable Harm* ....................................56
 E. *Balancing the Burdens* ..............................58
 F. *Public Interest* ......................................58

IV. *CONCLUSION* ...............................................59

## I. *INTRODUCTION*

Plaintiff Dr. Sagun Tuli, M.D. (hereinafter "Dr. Tuli") a female spinal neurosurgeon of Indian descent, filed a five-count complaint naming as parties defendant Brigham & Women's Hospital, Inc. (hereinafter "BWH" or "Hospital") and Dr. Arthur Day (hereinafter "Dr. Day"). Dr. Tuli, who was the first and only board-certified female neurosurgeon at BWH, asserts gender discrimination claims under both Title VII and Mass. Gen. Laws ch. 151B for disparate treatment and retaliation.[1]

---

1. Dr. Tuli also alleges violations of state and federal equal pay statutes, the Massachusetts Health Care Whistleblower Act, and interference with her advantageous employment relationship. Because her strongest arguments for a preliminary injunction arise under Title VII and Mass. Gen. Laws ch. 151B, the Court will focus on those claims.

The vast majority of Dr. Tuli's complaints center on Dr. Day and his treatment of her over a period of several years. These complaints provided the background for a Human Resources investigation in 2005, which corroborated Dr. Tuli's allegations in important respects, a formal letter of complaint in 2006, and culminated in this lawsuit in December of 2007. Earlier, in 2005 and 2007, two other female physicians (likewise of Indian descent) had also sued Dr. Day for gender discrimination.

Notwithstanding the atmosphere Dr. Tuli alleges, and her specific accusations against Dr. Day, Dr. Tuli continued to function as a neurosurgeon, and by all accounts, including defendants', an excellent one. Nothing in the record remotely challenges her skill as a neurosurgeon or her work.

Dr. Tuli's problems, according to the defendants, concerned "interpersonal issues," namely relationships with other physicians and staff, including Dr. Day. Allegations of "interpersonal issues" raised in the midst of discrimination complaints are notoriously complex and troubling. They *may* well be valid: A person who has been discriminated against has no license to be disruptive or abusive to her colleagues or subordinates. Alternatively, they *may* simply reflect discrimination by another name: The complainant is disliked precisely because she has rocked the boat.[2]

Here, Dr. Tuli offers substantial evidence to rebut the "interpersonal problems" claims. She offers affidavits from colleagues and staff. She raises questions about Dr. Day's role as the source of information about her problems, in permitting, even encouraging, staff mistreatment of her, and in exaggerating her problems to his colleagues. She questions the fairness of the behavioral standard applied to her, i.e. whether there was one standard of behavior applied to female physicians and another to male physicians, including Dr. Day. Dr. Tuli, for example, has adduced evidence of Dr. Day's own "interpersonal problems," not merely with women physicians at the hospital but also with other staff—problems which seemed to have had little or no effect on his advancement at BWH. To be sure, as with Dr. Tuli, Dr. Day offers substantial evidence to rebut those accounts. One thing is clear: Given the present posture of the record, this case is headed for a trial on the merits.

The instant proceeding, however, concerns a single decision, a decision made by BWH's Credentials Committee in the fall of 2007 requiring Dr. Tuli to consult Physician Health Services (hereinafter "PHS") as a condition of her being recredentialed—a process essential to her privileges at the Hospital. Dr. Tuli has moved for a preliminary injunction to block implementation of this requirement.

Shortly after Dr. Day became Chair of the Neurosurgery Department (hereinaf-

---

2. See Lauren B. Edelman et al., *Internal Dispute Resolution: The Transformation of Civil Rights in the Workplace,* 27 Law & Soc'y Rev. 497 (1993) (finding that internal complaint handlers tend to recast discrimination complaints as interpersonal problems.); Russell K. Robinson, *Perpetual Segregation,* 108 Colum. L. Rev. 1093, 1148 (2008) (citing Cheryl R. Kaiser & Carol T. Miller, *Derogating the Victim: The Interpersonal Consequences of Blaming Events on Discrimination,* 6 Group Processes & Intergroup Rel. 227 (2003)). In

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), for example, the Court found that the way in which the plaintiff had been treated was attributable to both discrimination and her allegedly poor "interpersonal skills." *Id.* at 235, 109 S.Ct. 1775. But the "interpersonal skills" problem was itself problematic; defendants suggested that it could be "remedied" by Hopkins' affecting a more feminine demeanor. *Id.* at 236, 109 S.Ct. 1775.

ter "Department") at BWH, Dr. Tuli came up for recredentialing. Because of patient complaints in Dr. Tuli's file (which did not bear on her surgical skills and which, for the most part, were not the basis for the Credentials Committee's ultimate recommendation), BWH's Provider Services Department recommended that Dr. Tuli be presented to the Committee as a Category 2 candidate—a lower level than previously—and further noted the "possibility" that she be referred to PHS for an evaluation.

What had only been a "possibility" became a *requirement* after the Credentials Committee met. According to Dr. Tuli, the Committee reached this decision as a result of Dr. Day's extensive participation in the process: He was the principle presenter of Dr. Tuli's case and was the source of the accounts of her "interpersonal problems." Under the circumstances, Dr. Tuli contends, defendants cannot disentangle those portions of Dr. Day's presentation that were based on a truthful appraisal of Dr. Tuli's performance and those that were based on discriminatory (and retaliatory) animus. While some effort was made to correct Dr. Day's skewed presentation of the plaintiff in a subsequent committee meeting—in which a different physician, Dr. Anthony Whittemore (hereinafter "Dr. Whittemore"), was the presenter—those efforts were hardly sufficient.

This Court referred the case to Magistrate Judge Collings for a Report and Recommendation (hereinafter "R & R") on Dr. Tuli's preliminary injunction motion. Judge Collings issued his R & R, a meticulous opinion, on May 1, 2008, recommending the denial of the motion. Dr. Tuli timely objected, based on both the legal standard imposed and the factual record.

After a hearing, supplemental briefing, and a careful review of the record, I have come to agree with plaintiff. First, Judge Collings concluded that Dr. Tuli failed to meet the final prong of the test enunciated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court characterized that prong very strictly: The plaintiff must show "evidence ... of such strength and quality as to permit a reasonable finding that ... [the decision] was *obviously or manifestly unsupported.*" See *Ruiz v. Posadas de San Juan Assocs.,* 124 F.3d 243, 248 (1st Cir. 1997) (quoting *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 346 (1st Cir. 1989)). For the reasons described below, I conclude that this is not the appropriate legal framework. When challenging a group decisionmaker—such as a tenure or credentials committee—the plaintiff can *also* meet the third prong of *McDonnell–Douglas* by showing that biased information was presented to the decisionmakers, information that substantially determined the decision of the group. When the factual record is reviewed in this light, the outcome is different.

Second, there is a better legal approach, which Magistrate Judge Collings considered in a footnote and rejected. With accusations of gender and national origin discrimination swirling around Dr. Day, the "mixed motive" paradigm, traditionally associated with *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and now embodied in 42 U.S.C. 2000e–2(m), is far more appropriate. The mixed motive framework recognizes that unlawful discrimination may well enter into a given decision even while other legitimate reasons are also present.

Given the accusations against Dr. Day, which were substantial, plaintiff *has* shown a likelihood of success on the merits on her claim that inappropriate animus played a role in the Credentials Committee's decision. As such, the burden of proof shifts to the defendants to show that the Com-

mittee would have reached the same decision absent the presence of discriminatory animus. On this record, they cannot meet that burden. Accordingly, after considering all of the preliminary injunction factors as described below, this Court now declines to adopt the R & R and **GRANTS** Dr. Tuli's Motion for Preliminary Injunction (document # 32).

Several caveats: This Court understands that the defendants have an important obligation to review Dr. Tuli's credentials, as they do with any physician, and that the work of the hospital must continue. While it is surely significant that no one contests Dr. Tuli's skill as a surgeon, and that patient complaints, for the most part, were not the basis of the PHS referral, nothing stands in the way of the defendant reconvening the Committee under circumstances that do not raise the issues described in this opinion. Moreover, given these concerns, the Court will also schedule the case for a trial at the earliest possible date.

## II. BACKGROUND

Magistrate Judge Collings' R & R provides an extensive and comprehensive summary of the facts in this case. The Court will not rehash all of those facts here, but will instead focus on the evidence that bears on the decision of the Credentials Committee and Dr. Day's role in it.

Dr. Tuli, a spinal neurosurgeon, joined the Department as an Associate Surgeon in July 2002.[3] She is the first and only female board-certified spine surgeon in the Harvard system. Dr. Day joined the Hospital staff around the same time and assumed the duties of Residency Director and Vice Chairman of the Department. At the time, Dr. Peter Black was Chair of the Department.

In 2002, at Dr. Black's request, Dr. Tuli became the Department's representative to the BWH Quality Assurance and Risk Management ("QARM") Committee, an important position.[4] She was responsible for reporting the Department's patient complications to the QARM Committee. In addition, in 2004, Dr. Tuli's workload increased significantly when two surgeons left the Department, leaving Dr. Tuli the sole remaining spine surgeon.

### A. Dr. Tuli and Dr. Day

In 2004, the relationship between Dr. Day and Dr. Tuli deteriorated. According to Dr. Tuli, Dr. Day did not take her seriously as a peer;[5] openly challenged her authority and knowledge but did not act similarly with male doctors; and in one of their first conversations referred to the field of epidemiology, in which Dr. Tuli had a master's degree, as a "girl's topic." Tuli Aff. ¶ 8, 14 (document # 36). Indeed, Dr. Day allegedly made numerous comments that comprise direct evidence of discrimination. For example, he would frequently refer to women as "girls" and make comments questioning Dr. Tuli's surgical judgment in gendered terms such as "What's the matter, are you afraid you can't handle it because you're a girl?"[6] Id. at ¶ 36.

---

**3.** The position carried with it the concurrent title of Instructor in Surgery at Harvard Medical School.

**4.** In 2003, Dr. Black also appointed Dr. Tuli as the Professionalism Officer for the Department.

**5.** On one occasion, Dr. Day saw one of Dr. Tuli's patients and consulted with the patient's cardiologist without informing Dr. Tuli first, as Hospital policy dictated. Exh. L to Defs.' Opp. 5 (document # 49–15).

**6.** A number of these incidents/allegations also appeared in a 2005 HR investigation report. See Exh. L to Defs.' Opp. 4 (document # 49–15).

Also, prior to the departure of the two other spine surgeons in 2004, in Department meetings Dr. Day would regularly address spine questions to the "spine guys" (the two male doctors), excluding Dr. Tuli from the conversation. *Id.* at ¶ 8.

Dr. Day's problems went beyond trivializing female doctors. There are accusations that he frequently used sexual innuendos and that he engaged in unnecessary physical contact with female professionals. At an event marking the end of the 2004 residency program, Dr. Tuli alleges that Dr. Day said, "Sagun can you get up on the table and dance for us to show the female residents how to behave?" Tuli Aff. ¶ 10 (document # 36).[7]

These accusations were made not only by Dr. Tuli, but other BWH staff as well. *See* Soni Aff. 1–8 (document # 41); Beal Aff. 1–4 (document # 39). The affidavits of Dr. Deepa Soni,[8] a female physician of Indian descent who completed her residency at BWH, Dana Thomas,[9] a surgical technician, and Robin Beal, a Patient Service Representative, corroborate Dr. Tuli's allegations as to Dr. Day's treatment of female doctors. Soni Aff. (document # 41); Thomas Aff. (document # 40); Beal Aff. (document # 39). By 2007, as described below, two women physicians of Indian descent, Dr. Soni and Dr. Malani

Narayanan had filed discrimination complaints against Dr. Day.

Dr. Day's relationship with Dr. Tuli was further complicated by Dr. Tuli's role on the QARM Committee. In 2004, the Committee asked Dr. Tuli to investigate one of Dr. Day's cases and ultimately voted to report the case to the Board of Registration of Medicine as a "major incident." Dr. Day told Janet Barnes, who worked in the Risk Management Department, that he was upset about the decision to report the case. Exh. B to Pinkham Aff. 52–53 (document # 35–3). A similar situation is alleged to have taken place in June 2005 when Dr. Day disagreed with the way in which Dr. Tuli presented one of his cases to the QARM Committee. Tuli Aff. ¶ 19 (document # 36).

In 2005, Dr. Tuli indicates that several male residents refused to respond when she paged them. She raised the issue with Dr. Day, then the director of the residency program, but the situation did not improve. Tuli Aff. ¶ 27–28 (document # 36). Carol Gedgaudos, who works as a surgical technologist at BWH, recalls that during 2005 or 2006 two male residents "did not feel it necessary to assist" Dr. Tuli and "appeared unconcerned that anything would be done about it." Gedgaudos Aff. ¶ 16 (document # 37).[10] In addition, by

---

7. *See also*, Tuli Aff. ¶ 57 (document # 36).

8. Dr. Soni recalls Dr. Day entering the operating room while she and Dr. Tuli performed surgery and saying, "What are you girls doing?" and "Oh, look, girls can do spine surgery." Soni Aff. (document # 41). She also remembers Dr. Day asking, "Are you sure you can do that? You are just a girl." *Id.* Dr. Day also made gendered assumptions with regard to surgeons' hand strength and the use of drills during surgery. *Id.*

9. In addition to corroborating Dr. Tuli's allegations that she did not receive the full support of the residency program and that Dr. Day made demeaning, sexist comments on

several occasions, Thomas Aff. ¶¶ 3, 12 (document # 40), Thomas, who is African–American, recounts an incident in which he alleges that Dr. Day grew impatient with him and said, in a loud tone of voice, "Boy, give me that A-clip!"

10. During Dr. Day's tenure as Residency Director, the residents are alleged to have arranged a party involving "cages and strippers." *See* Exh. 2 to Pl.'s Reply 1–5 (document # 53–3). According to Dr. Soni, Dr. Day approved an on-call schedule that put Dr. Soni, the only female resident, on-call at the time of the party. Soni Aff. 6 (document # 41). As the Professionalism Officer, Dr. Tuli raised

then, Dr. Narayanan, another female doctor of Indian descent, had filed a complaint with the Massachusetts Commission Against Discrimination (hereinafter "MCAD"), naming Dr. Day as a defendant, after being fired six months prior to the completion of her residency. Dr. Tuli had supported the rehiring of Dr. Narayanan; Dr. Day opposed it.

In the early fall of 2005, BWH's Human Resources Department (hereinafter "HR") initiated an investigation into "communication" issues among members of the Department after one of the chief residents complained about Dr. Tuli. The scope of the investigation, however, was not limited to Dr. Tuli but encompassed the entire Department.[11] The final HR investigation report corroborated some of Dr. Tuli's accusations about Dr. Day's relationship with female members of the staff, as well as some of the issues relating to Dr. Tuli.[12] As to Dr. Tuli, the report concluded that "Dr. Tuli's behavior needs to be addressed," but added that "it is hard to determine whether a lot of her outbursts and behavior are caused by the fact that she is severely overworked and placed into a senior position prematurely because of her colleagues' departure or if her behavior reflects her true personality." Exh. L to Defs.' Opp. 6 (document # 49–15). As to Dr. Day, the report noted that "Dr. Day should be reminded about the appropriate manner in which to address colleagues, especially women in the worksetting." *Id.* According to Dr. Tuli, Dr. Day blamed her

for the HR investigation. Tuli Aff. ¶ 45 (document # 36). Nevertheless, nothing in the record suggests that the issues raised in the report were ever addressed with either party.

By September 2005, Dr. Day and Dr. Tuli were barely speaking. *Id.* at ¶ 41. Around that time, Dr. Tuli, in an effort to clear the air, met with Dr. Day for nearly three hours. But rather than helping the situation, it exacerbated it. At one point, "Dr. Day described [the relationship between Dr. Tuli and himself] as similar to that of 'lovers,'" a word he had used with another female physician.[13] Tuli Aff. ¶ 41 (document # 36). He sat next to her, putting his hand on her arm, and told her that she had "cheated" on him by "'going after him' at [QARM] conferences." *Id.* He called her "deranged." *Id.* She did not respond to most of his statements because she feared he would begin shouting at her. *Id.* In addition, "[a]t the end of the meeting [she] went to shake his hand, but he put his arm around [her] for a prolonged period." *Id.*

In July 2007, following the departure of Dr. Black, Dr. Day became Chair of the Department. When Dr. Tuli requested that she be promoted to Director of Spine, Dr. Day allegedly told her that he wanted "my guy" to be Director and that "he wanted [Dr. Tuli] to continue to be a 'slave' for the department and be on call every other week, and continue to take care of

---

concerns about the party with the Department; it ultimately went forward without any inappropriate conduct.

11. There are allegations that, around that time, Dr. Day would shout at Dr. Black and Dr. Tuli. In effect, there was a battle for control of the department. Tuli Aff. ¶ 17 (document # 36).

12. In fact, the 2005 HR investigation of the Department found that "[s]ome [respondents to questions] indicated that, in general, if a female attending gives firm direction, she's viewed as a 'bitch' but, if a male attending does the same thing, it's ok." Exh. L to Defs.' Opp. 4 (document # 49–15).

13. Apparently, Dr. Day also used the used this "lovers" analogy in a conversation with Dr. Soni. Soni Aff. (document # 41).

the whole spine service." [14] Tuli Aff. ¶ 65 (document # 36).

In May 2007, Dr. Soni filed a complaint with MCAD naming Dr. Day as a defendant. In September 2007, Dr. Soni filed a rebuttal to BWH's Position Statement which made it clear that Dr. Tuli had supported her claims of discrimination. Tuli Aff. ¶ 71 (document # 36).

Just prior to Dr. Day's transition to Chair of the Department, Jean Stoddard, BWH's legal counsel, wrote to Dr. Day confirming that BWH had hired a lawyer to assist him in dealing with these discrimination complaints. The letter explained: "In light of the complaints of discrimination that have been brought against you, we believe that it is appropriate to provide you with both guidance and support in addressing various personnel management issues that currently exist and that may arise within the department during the transition...." Exh. 8 to Pl.'s Reply (document # 53–9). In a subsequent email to Dr. Day, Dr. Whittemore characterized this lawyer as "our mutual coach." Exh. 6 to Pl.'s Reply (document # 53–7).

Thus, when Dr. Day claims he did not know of Dr. Tuli's complaints or those of other women, a position adopted in the R & R, see R & R at 64, I find that his denial strains credulity.

## B. *Interactions with Dr. Whittemore*

In late 2005 and early 2006, Dr. Tuli raised her concerns about Dr. Day with Janet Barnes in Risk Management. Barnes suggested that Dr. Tuli speak to Dr. Whittemore, BWH's Chief Medical Officer. Over the course of the next year and a half, Dr. Tuli and Dr. Whittemore met numerous times.[15]

Dr. Whittemore took notes on some of his meetings with Dr. Tuli. His notes from a January 2006 meeting, for example (which were not shared with the Credentials Committee), indicate that they discussed "the residents' perception of her being viewed as a difficult person to deal with and the fact that residents are reluctant to scrub with her ... because she has a 'hard edge.'" Exhs. C & Q to Defs.' Opp. (documents## 49–6, 49–20). Significantly, the source of Dr. Whittemore's information was the residency program director, Dr. Day. *See id.* In February 2006, Dr. Whittemore also claimed to have received complaints from several nurses and a physician's assistant regarding their treatment by Dr. Tuli. However, the record reflects that the complaints related to a single incident, involving one of Dr. Tuli's patients, in which Dr. Tuli had chastised the staff for not being "compassionate" to the needs of the patient's husband; they had disagreed with her approach. Exh. R to Defs.' Opp. (document # 49–21).

In April 2006, Dr. Tuli sent a formal letter of complaint to Dr. Whittemore alleging "sex discrimination, national origin discrimination, a hostile work environment and retaliatory threats," "outrageous sexist comments, racist remarks, religious remarks, pay and promotion disparities and now false defamation of me, my character and my competence." Exh. U to Defs.' Opp. 1 (document # 49–24). Dr. Whitte-

---

14. According to Dr. Tuli, Dr. Day revoked her discretionary research privileges, informing her that in the future he would assign her research. *Id.* at ¶ 66. He also specifically barred her from pursuing the spine oncology research she had been working on because he wanted "his guy" to be the spine oncology person. *Id.*

15. Significantly, Barnes and Dr. Whittemore would later participate in the Credentials Committee process. Barnes was a member of the Committee; Dr. Whittemore was asked to address the Committee in December 2007, after Dr. Day had presented Dr. Tuli's case.

more responded with an email, which noted:

> [T]he concerns you raised in your letter ... mandate our concerted attention and subsequent investigation in concert with hospital policy. The allegations are intolerable and we need to address them with and for you, and for the institution. I have been in contact with Joan Stoddard as we discussed and it is our opinion that we share your concerns with Lisa Pontin and Eileen Burke from HR in an effort to outline the best course of action and to assure your protection in the process.

Exh. W to Defs.' Opp. (document # 49–26).

In a meeting on April 11, 2006, Dr. Whittemore acknowledged the seriousness of Dr. Tuli's complaints and advised her that the Hospital would take care to protect her rights. Exh. X to Defs.' Opp. (document # 49–27). At the same time, however, Dr. Whittemore suggested that Dr. Tuli leave BWH, questioning "whether this was the right place for her to continue at this particularly vulnerable point in her career" and suggesting that she "really might benefit from moving to another setting with a clean slate." [16] *Id.* Dr. Tuli's counsel followed up with a letter dated June 16, 2006, requesting that any investigation be postponed only "until the end of the summer." Exh. AA to Defs. Opp. (document # 49–30).[17]

In July 2006, Dr. Black stepped down as Chair of the Department; Dr. Whittemore became interim Chair and continued to meet with Dr. Tuli. Following one meeting in August 2006, Dr. Whittemore made notes reflecting his ongoing concern about Dr. Tuli's "role in creating her own problems." [18] Exh. DD to Defs.' Opp. (document # 49–33). It is unclear to what extent Dr. Whittemore based his conclusions on his own limited interactions with Dr. Tuli or, if not, what the source of his account was.

Following her annual performance review in early November 2006, Dr. Whittemore found Dr. Tuli to be "a clinically adept spine surgeon" who "provides superb surgical care for her spine patients." Exh. EE to Defs.' Opp. (document # 49–34). Dr. Whittemore, however, again noted concerns about "Sagun's behavior as perceived by nearly every segment of the provider environment," that she had "negative interactions with her own colleagues, the vast majority of resident staff, the orthopedic spine surgeons, anesthesiologists, perfusionists, and emergency room personnel." *Id.* He noted that unless her behavior changed, "[W]e would need to put into play some form of remediation for her to continue to participate here in the Department." Exhs. C & EE to Defs.' Opp. (documents ## 49–6, 49–34).

Again, the source of these negative observations is not clear, i.e. whether they derived from Dr. Whittemore's own observations, or other sources. Dr. Whitte-

---

**16.** This was not the first time Dr. Whittemore suggested that Dr. Tuli leave. Tuli Aff. ¶ 45, 58 (document # 36).

**17.** BWH has argued, and the R & R accepted, *see* R & R at 63, that counsel requested that no action be taken on the April 2006 letter. Counsel's July letter says no such thing. It only asks to defer action until the end of the summer.

**18.** Dr. Whittemore continues, "I have addressed this in a generic sense with her in the past, and this is particularly problematic given her role as the professionalism officer for the department, having been appointed as such by Dr. Black. Examples of the inappropriateness of this appointment and her difficult nature include recent incidents involving sharing microscopes in the operating room, calling in profusionists [sic] to run the cell saver off hours and on weekends, and inappropriate scheduling." *Id.*

more's comments, in some instances, are explicitly rebutted by the deposition testimony of Susan Lovell, the Charge Nurse at BWH, and Eileen Hardy, an OR nurse. See Exh. E & F to Pinkham Aff. (documents ## 35–6, 36–7). Nothing in the record suggests Dr. Whittemore consulted any of these individuals. In singling out Dr. Tuli's behavior, Dr. Whittemore did not address the concerns of the HR investigation about Dr. Tuli's workload or Dr. Day's conduct and its impact on Dr. Tuli.

In December 2006, however, the situation had begun to improve. Dr. Whittemore sent an email to Dr. Tuli in which he stated: "Sagun, I am getting great feedback regarding your overall demeanor. Great work, and have a terrific holiday." Exh. 4 to Pl.'s Reply (document # 53–5).

## C. *Lead up to October Credentials Committee Meeting*

Dr. Tuli's privileges had been renewed in November 2003 and in October 2005 as a Category 1, the highest level, both during the tenure of Dr. Black, the previous Chair. In January 10, 2006, the recredentialing process changed. For the first time, the Credentials Committee was required to consider patient complaints.[19] Exh. RR to Defs.' Opp. (document # 49–47). As part of Dr. Tuli's recredentialing, Joanne Hastings, manager of BWH's Provider Services Department, reviewed Dr. Tuli's file of patient complaints and compliments. Dr. Tuli had ten complaints on file, alleging a range of shortcomings.[20] Exh. MM to Defs.' Opp. (document # 49–42). BWH categorized the contents of the complaints as follows: attitude/appropriateness of comments (4 notations); accessibility (4 notations); patient readiness for discharge (1 notations); care (1 notations); responsiveness (2 notations); communication (2 notations). *Id.* Based on these complaints, Hastings informed the Department that Dr. Tuli would be presented as a Category 2 candidate.[21]

Mary Beth Mann, a Provider Services administrator, informed Dr. Day of Dr. Tuli's Category 2 status and noted the "possibility" that the Credentials Committee would refer Dr. Tuli to PHS for an evaluation. Exh. JJ to Defs.' Opp. (document # 49–39).

Around the same time, Dr. Whittemore met with Dr. Tuli to explain the Category 2 referral, a meeting which was unusual. Exh. B to Pinkham Aff. 136 (document # 35–3). Dr. Whittemore recorded his reflections at this time, reflections which seem to derive almost entirely from Dr. Day. According to the notes, Dr. Day summarized the general opinion of Dr. Tuli as "we just don't want to work with her, she's too difficult." Exh. OO to Defs.' Opp. (document # 49–44). He continued: "Day feels that the vigor of the spine service has

---

19. There is some confusion in the record about the circumstances under which doctors had been referred to PHS in the past. However, it appears that prior to 2006, doctors were referred to PHS only for problems significantly more serious than those alleged in this case. Exh. RR to Defs.' Opp. (document # 49–47). Since the change in 2006, the record reflects that the Committee has referred one other male doctor to PHS. *Id.* While that case is similar to Dr. Tuli's in some respects, the little that can be gleaned from the record regarding the circumstances of that referral make any comparison difficult. *Id.*

20. The ten complaints have to be put in context. In FY05 alone, Dr. Tuli saw 1,750 patients. Tuli Aff. ¶ 44 (document # 36).

21. A Category 2 candidate was defined as having records containing at least one of eight criteria, including: medical malpractice, settlements greater than one million dollars, involvement in criminal proceedings, and complaints from patients, doctors, nurses, or other hospital staff. Her complaints obviously involved only the latter.

dwindled as a direct result of this dysfunctional relationship." *Id.* Significantly, the only specific detail provided, which may or may not have been filtered through Dr. Day, referred to a single incident, a disagreement in the operating room between Dr. Tuli, a nurse, and two anesthesiologists.[22] Dr. Whittemore noted, however, that Dr. Tuli eventually apologized to the nurse and staff, and smoothed things out over dinner with the two anesthesiologists. *Id.* To Dr. Whittemore, even though there had been no other recent incidents, this was somehow "reminiscent of [Dr. Tuli's] behavior prior to 6–8 months ago." *Id.*

As described below, Dr. Day conveyed the same themes in his appearance before the Credentials Committee in October; Dr. Whittemore reiterated them two months later.

### D. *October Meeting*

The Credentials Committee met on October 9, 2007. Generally, Dr. Kai Frerichs, the Department's representative to the Committee, would have presented Dr. Tuli's case. However, because Dr. Frerichs was on vacation, per normal procedures the responsibility passed to Dr. Day. The record does not reflect that anyone raised the fairness of Dr. Day's participation given the serious complaints against him until after the October meeting.

Three members of the Credentials Committee had copies of Dr. Tuli's written file: Dr. Jonathan Coblyn (Committee Chairman), Dr. Day (Tuli's presenter), and Jean Stoddard (representative from BWH's legal department). In general, a written file includes summaries of the incidents or complaints responsible for the physician's Category 2 status.[23] Other Committee members knew the number and nature of the complaints, but did not possess copies. Exh. B to Pinkham Aff. 152 (document # 35–3).

The evidence of what occurred during Dr. Day's presentation comes primarily from the Barnes' deposition: Dr. Day mentioned the patient complaints but did not go into great detail; indeed, he minimized their significance. Exh. B to Pinkham Aff. 136 (document # 35–3). Rather, he indicated that her interactions with BWH doctors and staff posed greater concerns. *Id.* He admitted that Dr. Tuli was an excellent surgeon, *id.*, but when asked to describe Dr. Tuli's relations with doctors and staff, he asserted that she had "mood swings" and that her behavior was "often volatile." *Id.* at 137.

More specifically, Dr. Day suggested that "approximately thirty" operating room staff were reluctant to work with Dr. Tuli. *Id.* He offered no documentation of that sweeping statement; it is rebutted by Dr. Tuli's witnesses.[24] He also claimed that he had personally intervened to pre-

---

**22.** The disagreement concerned safety issues. After an incident in which a BWH surgeon performed a craniotomy on the wrong side of a patient's skull, Dr. Tuli insisted on strict adherence to the procedure known as a "safety pause" in which everyone in the operating room states aloud the name of the patient and the procedure to be performed. Tuli Aff. 68–70 (document # 36). The anesthesiologist disagreed with Dr. Tuli's approach. *Id.* In addition, there was a dispute with a nurse during the procedure. *Id.* Both incidents were resolved at a subsequent dinner, *id.*, and found to have been insubstantial by a subse-

quent HR investigation, *see* Exh. C to Pl.'s Obj. (document # 65–4).

**23.** In his affidavit, Dr. Coblyn explains that "while this is a subjective standard, these patient complaints were seen as red flags to be reviewed." Exh. QQ to Defs. Opp. 1 (document # 49–46).

**24.** Susan Lovell, the Charge Nurse at BWH, testified that in the fall of 2007 it was not true that there were thirty people who would not work with Dr. Tuli in the OR. Exh. E to Pinkham Aff. 29–30 (document # 35–6). Ei-

vent a doctor from complaining to HR about Dr. Tuli.[25] *Id.* Still, while he closed his presentation by asserting that he did want Dr. Tuli to be re-credentialed, *id.* at 141, when asked specifically, he admitted that he would not be disappointed should the Committee decline to do so. *Id.* at 139. He recalls closing his presentation by adding that "interpersonal training would allow her the best chance to be as successful as she should be." Exh. D to Defs.' Opp. (document # 49–7).[26]

Significantly, according to Barnes, the Committee had little information to put Dr. Day's comments in context. While she and Dr. Coblyn knew of Dr. Tuli's prior complaints about Dr. Day, other members of the Committee did not understand the full history. *Id.* at 200. There was no indication that this problem was even discussed. Nor was any evidence offered to rebut Dr. Day's sweeping generalizations about Dr. Tuli's problems, evidence which was available, and which pointed to a different conclusion.

After discussing Dr. Day's presentation, the Committee voted to re-credential Dr. Tuli as a Category 1 surgeon for four months rather than the generally expected two years, provided, however, that she receive an evaluation through PHS and follow the recommendations, if any.

### E. *Interim Period Between Credentials Committee Meetings*

After the October 2007 meeting, it is clear that some members of the Committee became concerned about Dr. Tuli's treatment and Dr. Day's participation in the process. Barnes, for example, noted that this was the first time the Committee had addressed the behavioral issues of a female surgeon. Exh. B to Pinkham Aff. 174 (document # 35–3). Her comments are telling: In her two years' experience with the Committee, she had not seen male surgeons who were saddled with similar patient complaint records reviewed in the same manner. *Id.*

Barnes raised these issues at a meeting with Dr. Coblyn, Stoddard (legal counsel), and Dr. Whittemore. During the meeting, Dr. Coblyn expressed concerns about the lack of "specificity" of events Dr. Day related in his presentation to the Committee. *Id.* at 181. Dr. Whittemore, however, mentioned his history of working with Dr. Tuli, underscoring what he called her "behavioral issues," but offered no specifics either. At the end of the meeting, it was decided that Barnes would contact Dr. Tuli and suggest that she follow the Committee's advice and make an appointment with PHS. Exh. B to Pinkham Aff. 183 (document # 35–3).

In addition, Dr. Coblyn asked Dr. Whittemore to address the Committee at its next meeting. Exh. QQ to Defs.' Opp. (document # 49–46). Dr. Coblyn agreed that this was an unusual step, but asserted that he wished to ensure that the Committee was not basing its decision solely on

---

leen Hardy, an OR nurse, testified that it may be true that many nurses do not want to assist Dr. Tuli in surgery, but "only because she is— her surgery is very difficult. You go home exhausted, and she goes home doubly exhausted.... [P]eople don't like the hard work." Exh. F to Pinkham Aff. 20–21 (document # 35–7). Hardy also acknowledged that Susan Lovell would be in the best position to identify whether there were thirty people in the OR who refused to work with Dr. Tuli. *Id.*

**25.** Dr. Tuli asserts that these claims are not substantiated by interviews with witnesses.

**26.** Barnes remembers that Dr. Day suggested that Dr. Tuli needed anger management training, Exh. B to Pinkham Aff. 137 (document # 35–3), and "hoped" she could be "rehabilitated" by anger management courses, *id.* at 141.

Dr. Day's statements. *Id.* As described below, it is not clear that Dr. Whittemore accomplished this task.

### F. *December Credentials Committee Meeting*

Dr. Whittemore focused on his experiences with Dr. Tuli during his time as interim Chair of the Department and in meetings with her from the preceding year.[27] Exhs. C & QQ to Defs.' Opp. (documents ## 49–6, 49–46). According to multiple accounts of the meeting, Dr. Whittemore recalled the difficulties Dr. Tuli faced after the departure of two spinal surgeons and her requests for additional pay to compensate for the resulting increased workload. Exh. B to Pinkham Aff. 198–200 (document # 35–3). He suggested that once these compensation increases went through, Dr. Tuli dismissed her attorney and things improved. *Id.* He also referenced Dr. Tuli's concerns about unfair on-call schedules and complaints against Tuli by residents and staff and explained that he had met with her regularly for more than a year to work through these issues. Exh. QQ to Defs.'s Opp. 2 (document # 49–46).

Dr. Whittemore specifically mentioned the 2005 HR investigation but, significantly, not in any great detail. He indicated only that it had "substantiated some of these issues." Exh. QQ to Defs.' Opp. 2 (document # 49–46). What he apparently *did not* recount was HR's conclusion that Dr. Tuli's issues may have stemmed from *either* interpersonal difficulties or simple work-related exhaustion. Nor did Dr. Whittemore recount HR's finding that *Dr. Day* needed guidance on how to appropriately address women in a professional environment. Indeed, Dr. Whittemore did not inform the Committee about Dr. Tuli's

extensive complaints about Dr. Day, or the other complaints that had been filed against him.

Finally, Dr. Whittemore told the Committee that Dr. Tuli's demeanor had improved in 2006 and early 2007, but that her interpersonal problems with staff resumed in July 2007 (when Dr. Day became Chair of the Department). Exh. B to Pinkham Aff. 198 (document # 35–3). Still, the only specific event Dr. Whittemore referred to as evidence of this "resumption," was the incident in late August 2007 involving a dispute among Dr. Tuli, a nurse, and two anesthesiologists, about which he had spoken to Dr. Tuli and which had been resolved. *Id.* at 199–200. Dr. Whittemore did not mention the resolution. Exh. OO to Defs.' Opp. (document # 49–44). Indeed, notes from a subsequent HR inquiry referred to the anesthesiologists incident as "not out of the ordinary" and an "isolated mis-communication." Exh. C to Pl.'s Obj. (document # 65–4).

After hearing Dr. Whittemore's presentation, none of the Committee members in attendance at the December 2007 meeting moved to reconsider or reopen their previous decision.

## III. *DISCUSSION*

### A. *Standard*

 The standard for evaluating a motion for a preliminary injunction is the following:

1) the plaintiff's likelihood of success on the merits; 2) the potential for irreparable harm in the absence of an injunction; 3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and 4) the effect, if any, on the

---

**27.** The account of Dr. Whittemore's presentation before the Committee is drawn primarily

from the Barnes deposition and the affidavits of Drs. Whittemore and Coblyn.

public interest. The first factor, the plaintiff's likelihood of success, is the touchstone of the preliminary injunction inquiry. If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.

*Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 11 (1st Cir.2008). The moving party—here, Dr. Tuli—bears the burden of establishing that the four factors weigh in her favor. *Esso Standard Oil Co. v. Monroig–Zayas*, 445 F.3d 13, 18 (1st Cir.2006). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995).

### B. *Likelihood of Success on the Merits*

The Court must first address the threshold question of *what* Dr. Tuli would need to show at trial in order to prevail on her present claim. It is here that the Court must part ways with Judge Collings' R & R.

Title VII case law has developed two parallel paths to liability. The first, encapsulated in the Supreme Court's decision in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), involves situations in which the plaintiff alleges that she was discriminated against because of her membership in a protected class. The proof may well be circumstan-

tial—that the reasons offered by the employer for taking an adverse employment action were in fact merely a pretext for discrimination. *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 336 (1st Cir.2005).

The second path, traditionally associated with *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), deals with so-called "mixed motive" cases, in which the plaintiff alleges that discrimination was *among* the reasons for the adverse employment decision but not necessarily the sole reason. *Price Waterhouse* itself, however, was superceded by the Civil Rights Act of 1991, which adopted the case's central proposition—that an employer may be held liable where a plaintiff establishes that illegal animus was a motivating factor, but not necessarily the sole factor, in an adverse decision. *See* 42 U.S.C. § 2000e–2(m) (codifying the mixed motive standard).[28]

The differences in the two theories are significant. The mixed motive theory of discrimination recognizes that

> motivation is complex and that it is rare for an employer to be entirely motivated by bias, or entirely free of it. Rather, it is more likely that an employer will have parallel motivations—some lawful, some unlawful.

*Vesprini v. Shaw Indus., Inc.*, 221 F.Supp.2d 44, 56 (D.Mass.2002) (citing Benjamin C. Mizer, *Towards a Motivating Factor Test for Individual Disparate Treatment Claims*, 100 Mich. L. Rev. 234 (2001)), *aff'd*, 315 F.3d 37 (1st Cir.2002).

---

**28.** Prior to the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), some courts defined *McDonnell–Douglas* as applying to cases involving circumstantial evidence of discrimination, while "mixed motive" cases involved direct evidence of discrimination. *See Vesprini v. Shaw Contract*

*Flooring Servs.*, 315 F.3d 37, 40–42 (1st Cir. 2002). *Desert Palace* made it clear that plaintiffs in mixed motive sex discrimination cases do not bear any additional burden of proof than the ordinary plaintiff, nor are they limited to proving discrimination using direct evidence. *Id.* at 101–02, 123 S.Ct. 2148.

In this case—comprised of a record of accusations and counter—accusations, formal and informal complaints—the approach is particularly compelling.

Further, the choice of theory could well be outcome-determinative in a preliminary injunction proceeding with a truncated record. In a mixed motive case, once the plaintiff proves that discrimination was a motivating factor in the employer's decision, the burden of persuasion (not just the burden of production as in *McDonnell–Douglas*) shifts to the employer to show that the decision would have been the same without the discriminatory animus. 42 U.S.C. § 2000e–5(g)(2)(B). In other words, if the record is not clear, the decision goes against the party with the burden of proof—here, defendants. As described below, I conclude that there is a substantial likelihood that Dr. Tuli will show that discrimination was a motivating factor in the Committee's decision to require Dr. Tuli to be evaluated by PHS in the fall of 2007; that given Dr. Day's central role in the PHS decision, legitimate reasons cannot be disentangled from illegitimate; and given the current record, BWH cannot meet its affirmative burden of showing that the decision would have been the same despite the illegitimate factors.

Finally, the choice of theory defines the relief. Under current statutory and case law, the scope of remedies available to a Title VII plaintiff is determined by the extent to which discriminatory animus played a part in the ultimate adverse employment action: Where a plaintiff experiences an adverse employment action entirely "because of" discriminatory animus, the law makes available the full panoply of legal and equitable remedies, including reinstatement, back pay, etc. 42 U.S.C. § 2000e–5(g)(1). Where, however, discriminatory animus is a motivating factor but the defendant can demonstrate that it "would have taken the same action in the absence of the impermissible motivating factor," Title VII still attaches liability, but limits the available remedies. *See* 42 U.S.C. § 2000e–5(g)(2)(B). In the instant case, I conclude that equitable relief—in the form of enjoining BWH from imposing the PHS condition based on the 2007 Committee meetings—is appropriate, both as a matter of law and fact.

I will first address *McDonnell Douglas*, since that was the framework employed in the R & R, before moving to an analysis of the mixed motive standard.

### 1. *The McDonnell Douglas Framework*

 Under the burden-shifting framework set forth in *McDonnell Douglas*, a plaintiff establishes a presumption of gender discrimination by establishing 1) that she is a member of a protected class; 2) that an adverse employment action was taken against her; 3) that she was otherwise qualified for the position; and 4) that a similarly situated male was treated differently. *See DeCaire v. Mukasey*, 530 F.3d 1, 15 (1st Cir.2008). Once the plaintiff has established a presumption of discrimination, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for its adverse employment action." *Id.* at 15. "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for [the challenged action] was in fact a pretext for" discrimination. *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 336 (1st Cir.2005) (citations omitted).

In his R & R, Judge Collings held that as to the third stage of the burden-shifting framework, Dr. Tuli could not show a likelihood of success on the merits. According to the Court, she had not proffered " 'evi-

dence ... of such strength and quality as to permit a reasonable finding that ... [the reasons for the Credentials Committee's decision] were *obviously or manifestly unsupported.*'" R & R at 49 (quoting *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir.1997) (quoting *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 346 (1st Cir.1989))).

The standard as recited, however, is incomplete. *Brown* reflected the First Circuit's concern about the unique context of the case, an accusation of discrimination involving a college tenure committee's decision. 891 F.2d at 340–41. While it was obvious that anti-discrimination laws apply to the academy, the Court was wary of improperly substituting its conclusions for that of a tenure committee. *Id.* at 346. The committee's conclusions could thus be challenged only if they were wholly inappropriate, described as "manifestly or obviously unsupported."[29] *Id.* at 346.

The concerns in *Brown* are plainly relevant here. This Court is also wary about intervening in the Hospital's credentialing process. But hospitals, like universities, are subject to the constraints of Title VII and 151B. The challenge is to enforce those obligations in a way that respects the important interests at play in the hos-

pital context. *Brown* is one approach, but there is another. Plaintiffs can show that a group's decision was tainted by the participation of a biased committee member or presenter who misrepresented the facts to the others, or who made wholly inappropriate or discriminatory comments that determined the outcome.[30] Where the decisionmaker is a collectivity, courts have looked to whether or not, and to what degree, the actor with discriminatory intent was in fact in control of the result.

Such an approach does not require a court to engage in a substantive review of the decision—who should get tenure in the English department of Boston University, as in *Brown*, or who does or does not get along with staff, as here. Rather, the court looks to the fairness of the procedure, i.e., was the decisionmaking process biased as a result of events outside the committee room? Can that bias be separated from the legitimate decisionmaking process?[31]

*Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77 (1st Cir.2004), is analogous. There the Court concentrated on the third stage of the *McDonnell Douglas* burden-shifting paradigm under Mass. Gen. Laws. ch. 151B.[32] It addressed "whether a corpo-

---

**29.** It should also be noted that *Brown* was decided before the passage of the Civil Rights Act of 1991 and the codification of the mixed motive framework.

**30.** Indeed, in *Brown*, the president of the university was quoted as saying, "I don't see what a good woman in your department is worrying about. The place is a damn matriarchy," and, "[Y]our husband is a parachute, so why are you worried?" during a discussion of a female professor's tenure candidacy. *Id.* at 349.

**31.** *See EEOC v. Tufts Inst. of Learning*, 421 F.Supp. 152, 162, 164 (D.Mass.1975) (the plaintiff, a faculty member under consideration for tenure, "was entitled to be judged by a sub-committee that was free from the influ-

ence of sex bias"). In *EEOC* the university plainly knew about the accusations of sex bias that had been made against the Art Department Chair, but nonetheless allowed the process, in which he extensively participated, to continue.

**32.** Massachusetts courts have adopted the *McDonnell Douglas* framework for analyzing ch. 151B claims. Chapter 151B "sets out four elements: membership in a protected class, harm, discriminatory animus, and causation." *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 502, 751 N.E.2d 360 (2001). In the third stage of the analysis, courts assess whether the adverse employment action was "because of" the discrimination, noting that the discriminatory animus need not be "the

ration can be held liable for discrimination when neutral decisionmakers, free of any [discriminatory] animus, rely on information that is manipulated by another employee who harbors ... discriminatory animus." *Id.* at 79. The answer was "yes."

Cariglia had been employed as a branch manager by the defendant and alleged that he was terminated as a result of age discrimination on the part of his immediate supervisor. *Id.* at 80. The supervisor, according to Cariglia, had deliberately misrepresented facts to the decisionmaker in his recommendation that Cariglia be terminated. *Id.* The Court agreed and held that Cariglia's employer could be found liable even though the ultimate decisionmaker had harbored no discriminatory animus. Perhaps more importantly, however, the Court held that the issue that had been tainted by the discrimination need only be a "pivotal consideration" in the ultimate decision—as opposed to the sole reason—for liability to attach. *Id.* at 86. Indeed, in its approach, the Court seemed to adopt a standard approximating the traditional tort standard for causation—which allows for multiple proximate causes—bringing *McDonnell Douglas* closer to the mixed motive paradigm. *Id.* at 88–89 ("*he need only show that the [tainted information] contributed significantly to [the adverse action], that it was a material and impor-*

*tant ingredient in causing it to happen* ") (emphasis added).

In this respect, *Cariglia* and its progeny provide a far more appropriate framework for analyzing the facts of this case, which focus on the motivations of Dr. Day rather than the Credentials Committee, than traditional *McDonnell Douglas* burden shifting.[33] Thus, at least for purposes of ch. 151B, the Court's focus should be on whether Dr. Day "concealed relevant information from the decisionmakers ... or fed false information to them, and was able to influence the decision." *Thompson v. Coca–Cola Co.*, 522 F.3d 168, 179 (1st Cir. 2008) (quoting *Cariglia*, 363 F.3d at 87) (alterations omitted).

Obviously, the decision in *Cariglia* may have been different if plaintiff had been given a "meaningful opportunity to address the reasons for his termination." *Thompson*, 522 F.3d at 179. The plaintiff in *Thompson* alleged that he had been fired based on the recommendation of a coworker who harbored racial/ethnic animus. However, because the plaintiff had been given a chance to confront the allegations against him directly, thereby allowing the decisionmaker to come to a neutral and unbiased conclusion, *Cariglia* was not applicable. *Id.* The SJC echoed this charac-

---

only cause of that action." *Id.* at 84. The First Circuit has also written: "In our view, federal and Massachusetts law are now generally aligned on the pretext issue." *Fite v. Digital Equip. Corp.*, 232 F.3d 3, 7 (1st Cir. 2000).

**33.** Recently, the continued usefulness of the *McDonnell Douglas* framework has faced serious criticism. *See* Martin J. Katz, *Reclaiming McDonnell Douglas*, 83 Notre Dame L. Rev. 109, 112–15 (2007). In fact, following the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), some commentators have gone as far to say that *McDonnell Douglas* is "dead." *Id.* at 114. While the Court need

not engage in that debate here, it does note that courts should hesitate to shoehorn all discrimination cases into the *McDonnell Douglas* framework. *McDonnell Douglas* provides nothing more than "a method of proof. The problem has been that the framework has also tended to be seen as something more than a method of proof: it has also tended to be seen as denoting a substantive standard ('but for') or an allocation of the burden of proving 'but for' causation (to the plaintiff).... [*McDonnell Douglas*] should be understood as a method of proof, and nothing more." *Id.* at 144 (internal citations omitted).

terization of *Cariglia* in *Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329 (2004), writing:

> When assessing the independence of the ultimate decision maker, courts place considerable emphasis on the decision maker's giving the employee the opportunity to address the allegations in question, and on *the decision maker's awareness of the employee's view that the underlying recommendation is motivated by bias or a desire to retaliate.*

*Id.* at 600, 814 N.E.2d 329 (emphasis added) (citing, inter alia, *Cariglia*, 363 F.3d at 87 n. 4).

The First Circuit recently reaffirmed *Cariglia* in *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1, 19 (1st Cir.2008):

> [L]iability may be found where (a) a discriminating subordinate (b) causes the firing of a plaintiff by (I) intentionally giving false information to and (ii) withholding accurate information from the decisionmaker, (c) the decisionmaker's decision is significantly based on these very inaccuracies, and (d) the plaintiff has been given no opportunity to provide contrary information.

*Cerqueira*, 520 F.3d at 19. While the First Circuit has not decided whether the *Cariglia* test applies in the Title VII context, other circuit courts have.[34] *Id.* at 19 n. 24 (citing *Brewer v. Bd. of Trs.*, 479 F.3d 908, 918 (7th Cir.2007); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir.2004)); *see also Stoller v. Marsh*, 682 F.2d 971, 972 (D.C.Cir.1982) (Title VII); *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir.2003) (same).[35]

Following *Thompson*, the Court should consider whether Dr. Tuli's rebuttals had been presented to the Committee in any form. (She, obviously, was not allowed to appear.) Moreover, the Court should consider whether the follow-up session at which Dr. Whittemore was the presenter, comprised a sufficiently independent presentation to vitiate any discriminatory animus Dr. Day brought to bear to the process.

### 2. *Price Waterhouse/42 U.S.C. § 2000e–2(m)*

By passing the Civil Rights Act of 1991, and in particular 42 U.S.C. § 2000e–2(m), Congress essentially rejected Justice O'Connor's concurrence in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct.

---

**34.** In fact, the First Circuit *has* considered discriminatory comments by an individual decisionmaker who was not the final decisionmaker but who was in a position to influence that decisionmaker. *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir.2000).

Here, however the distinction is of little practical consequence, as Dr. Tuli has filed under both Title VII and Massachusetts law. For this reason, and because the First Circuit has signaled its approval of *Cariglia* in the Title VII context, the Court will utilize the same standard for Dr. Tuli's Title VII and 151B claims. *See Davila v. Corporacion de P.R. para la Difusion Publica*, 498 F.3d 9, 17 n. 3 (1st Cir.2007) (citing *Cariglia* with approval in an ADEA case).

**35.** Among the federal circuit courts, this form of liability is known as the "rubber stamp" or

"cat's paw" theory of liability. *Arendale v. City of Memphis*, 519 F.3d 587, 604 n. 13 (6th Cir.2008). The Seventh Circuit—the first court to use the "cat's paw" terminology—in particular, has narrowed the application of the theory: "[W]here a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker." *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir.2007). *See generally,* Taran S. Kaler, *Controlling the Cat's Paw: Circuit Split Concerning The Level of Control a Biased Subordinate Must Exert Over The Formal Decisionmaker's Choice to Terminate*, 48 Santa Clara L. Rev. 1069 (2008).

1775, 104 L.Ed.2d 268 (1989), and codified Justice Brennan's plurality opinion. That opinion suggested that Title VII plaintiffs need only prove by direct or circumstantial evidence that gender played a *motivating part* in an employment decision in order for liability to attach. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101–02, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *see also Burton v. Town of Littleton,* 426 F.3d 9, 19–20 (1st Cir.2005); *Gross v. FBL Fin. Servs., Inc.,* 526 F.3d 356, 360 (8th Cir. 2008) ("[42 U.S.C. § 2000e–2(m) ] does supersede *Price Waterhouse* and its requirement of 'direct evidence' in the context of Title VII claims, and makes 'motivating factor' the touchstone of the analysis for liability.").

Under § 2000e–2(m), "an unlawful employment practice *is established* when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." [36] (emphasis added.) In order to prevail on a claim under § 2000e–2(m), "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.' " *Desert Palace,* 539 U.S. at 100–02, 123 S.Ct. 2148 (quoting § 2000e–2(m)).

■ If the defendant demonstrates that it "would have taken the same action in absence of the impermissible motivating factor," the statute limits the remedies available to the plaintiff, but does not defeat liability. *See* 42 U.S.C. § 2000e–5(g)(2)(B). "In other words, 'the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff.' " [37] *De-Caire,* 530 F.3d at 18 (citing *Desert Palace,* 539 U.S. at 94, 123 S.Ct. 2148); *see also Cariglia,* 363 F.3d at 83–84 n. 2 (stating standard under Massachusetts law).

A mixed motive approach is particularly applicable given the accusations and counter-accusations in this case, the ambiguity of "interpersonal problems" in that atmosphere, and the complexity of dealing with the Committee's decisionmaking process.

### 3. *Retaliation*

Title VII, 42 U.S.C. § 2000e–3(a) makes it unlawful for an employer to discriminate

---

**36.** In keeping with the analysis of the previous section, the members of the Committee need not have been personally motivated by discriminatory intent for the process to have been conducted in bad faith it the Committee was merely acting as the "cat's paw" for others with the requisite motive. *Cf. Cariglia,* 363 F.3d at 88–89; *Gee v. Principi,* 289 F.3d 342, 346 (5th Cir.2002) ("[W]hen the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact.").

**37.** There is a technical reading of the statute which provides additional support for plaintiff's case. Where the defendant succeeds in asserting the affirmative defense of causation, the defendant is still found liable—for allowing impermissible animus to be a motivating factor in an employment decision—but the remedies are limited. The statute expressly bars courts from awarding "damages or issue[ing] an order requiring any admission, reinstatement, hiring, promotion, or payment, as described in [42 U.S.C. § 2000e–5(g)(2)(A) ]." (The same restrictions apply to retaliation claims. 42 U.S.C. § 2000e–5 (g)(2)(A).)

What Dr. Tuli is seeking here arguably does not fit into these exclusions. She seeks an order from this Court enjoining a specific decision—BWH's decision to condition her privileges on a requirement imposed as the result of discrimination—not an order of reinstatement or promotion, for example.

I do not have to address this interpretation of the statute since I conclude that the defendants have not proved their affirmative defense of causation on this record.

against an employee because "he has opposed any practice made an unlawful employment practice [by this title] ..., or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing." Massachusetts law provides similar protections. *See* Mass. Gen. Laws ch. 151B, § 4(4); *Mole,* 442 Mass. at 591–92, 814 N.E.2d 329.

 To prove a prima facie case of retaliation, a plaintiff must prove 1) that she engaged in protected conduct under Title VII; 2) that she suffered an adverse employment action; and 3) that the adverse action is causally connected to the protected activity. *See Dressler v. Daniel,* 315 F.3d 75, 78 (1st Cir.2003); *see also Mole,* 442 Mass. at 591–92, 814 N.E.2d 329 (stating virtually identical Massachusetts standard). The evidence of retaliation can be direct or circumstantial. *DeCaire,* 530 F.3d at 13–14. The rest of the analysis follows the discrimination framework, though a finding of discrimination is not a prerequisite for a finding of retaliation. *See Abramian v. President & Fellows of Harvard Coll.,* 432 Mass. 107, 122, 731 N.E.2d 1075 (2000).

 The First Circuit has recently explained why discrimination is not an element of retaliation. The Court noted that " '[t]he substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e. their conduct.' " *DeCaire,* 530 F.3d at 19 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 63, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). Thus, the Court continued, "It therefore does not matter for retaliation purposes whether [defendant] would have treated a [similarly situated male] the same way he treated [plaintiff]. The relevant question is whether [defendant] was retaliating against [plaintiff] for filing a complaint, not whether he was motivated by gender bias at the time." *Id.*

That Dr. Tuli opposed practices made unlawful by Title VII and 151B is clear. The question is whether there is a causal connection between the PHS condition and that activity. The R & R concluded there was none. I disagree.

## C. *Applying the Law to the Facts*

 Resolution of Dr. Tuli's preliminary injunction motion requires the Court to determine whether Dr. Tuli has made a sufficient showing 1) that Dr. Day's presentation to the Credentials Committee in October 2007 was tainted by discriminatory and/or retaliatory animus, in whole or in part; and 2) that the subsequent presentation of Dr. Whittemore in December 2007 did not constitute a sufficient antidote to the effects of any such discrimination. The Court notes that its conclusions "as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes." *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6 (1st Cir.1991).

While the factual underpinnings of Dr. Tuli's allegations against Dr. Day are in dispute, the weight of the evidence in the record suggests that Dr. Day did in fact harbor gender-based discriminatory animus toward Dr. Tuli and held her to different behavioral standards than male physicians. To begin with, the comments Dr. Day is alleged to have made were not merely generalized sexist comments—which, candidly, would raise suspicion on their own—but were directly aimed at Dr. Tuli and her competence and comportment

as a surgeon.[38] They suggest a gendered and stereotypical view of how female doctors, and specifically Dr. Tuli, are supposed to behave.[39]

In addition to the accounts of Dr. Tuli and others regarding Dr. Day's various allegedly sexist comments, the record also contains the results of an HR investigation that noted the perception of differing standards of behavior for male and female doctors (women who were strict were "bitches"; men were not) and concluded that "Dr. Day should be reminded about the appropriate manner in which to address colleagues, especially women in the workplace." Exh. L to Defs.' Opp. (document # 49–15). The report provides strong independent support for Dr. Tuli's allegations as to the prevailing atmosphere in the Department.

Indeed, the evidence in the record suggests that Dr. Day's demeaning comments were more than a collection of isolated and unrelated "stray" comments, *see Thompson,* 522 F.3d at 178, but rather reflected and reinforced an ongoing course of conduct that was largely unremedied despite being repeatedly brought to the attention of Hospital staff and administrators. *See Vesprini,* 221 F.Supp.2d at 59–60 (arguably discriminatory comments are to be taken at "face value"). It was, in short, more than a problem of perception. The Hospital was prepared to tolerate Dr. Day's outbursts and displays of anger, but not Dr. Tuli' s.[40]

Perhaps the clearest evidence of Dr. Day's discriminatory animus is a notation he made in a confidential peer review form in preparation for the October 2007 meeting, stating that Dr. Tuli had "episodic, unpredictable, volatile behavior when she becomes hostile, vindictive, irrational, demanding," and that Dr. Day believed Dr. Tuli's mental health was "questionable." [41] Exh. MM to Defs.' Opp. 2 (document # 49–42). There is nothing in the record to support a conclusion that was nearly as extreme, that Dr. Tuli's mental health was "questionable." While it is unclear whether the form was presented to the Credentials Committee, it does provide insight into Dr. Day's attitude toward Dr. Tuli in the lead-up to his presentation.

It is extraordinary that Dr. Day would be allowed to present Dr. Tuli to the Committee given his personal history with her, which had not been fully aired before the Committee; the accusations that other women doctors of Indian descent had made; and in light of the assurances given by Dr. Whittemore that the Hospital would see to it to protect Dr. Tuli from any retaliation.[42] *See* Exh. X to Defs.'

---

**38.** That many of these incidents took place before Dr. Day assumed the role of Chairman of the Department does not put them outside of the Court's consideration.

**39.** To counter these accusations, Defendants have submitted a number of letters, including one signed by 17 doctors at BWH and Children's Hospital Boston, attesting to his support for the training of female neurosurgeons. *See* Exhs. UU & VV to Defs. Opp. (documents ## 49–50, 49–51).

**40.** As the Supreme Court noted in *Price Waterhouse:* "It takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course in charm school.' Nor ... does it require expertise in psychology to know that, if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that has drawn the criticism." 490 U.S. at 256, 109 S.Ct. 1775.

**41.** It is unclear from the record whether the Credentials Committee had seen this form prior to the Committee's meeting.

**42.** The evidence suggests that BWH's legal counsel, Jean Stoddard, was on notice of Dr. Tuli's multiple complaints about Dr. Day over

Opp. (document # 49–27). In this context, it is difficult, if not impossible, to disentangle those portions of Dr. Day's presentation that were based on a truthful appraisal of Dr. Tuli's performance and those portions motivated by discriminatory or retaliatory animus. One does not have to fully credit each and every accusation here—and many are contested—to conclude that Dr. Day's motivations were, at the very minimum, mixed.

A reasonable reading of the evidence in the record suggests that Dr. Day gave a one-sided, decidedly negative account of Dr. Tuli's difficulties with other members of the hospital staff and exaggerated the extent of the problem. The very language that he used—the phrase "mood swings" in particular—is itself evocative of gender-based stereotypes. Given the evidence in the record, the Court concludes that Dr. Tuli would likely succeed in proving that Dr. Day's presentation to the Committee was motivated, at least in part, by discriminatory animus.[43]

Moreover, it is clear that Dr. Day's unbalanced characterizations and representations to the Committee regarding Dr. Tuli's interactions with colleagues and staff, and not patients, played a significant role in the Committee's ultimate determination. *See Cariglia*, 363 F.3d at 88–89 (plaintiff "need only show that the [tainted information] contributed significantly to [the adverse action], that it was a material and important ingredient in causing it to happen"); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 584–85 (5th Cir.2003). Patient complaints were not significant. Janet Barnes testified that Dr. Coblyn had not been "impressed" by the patient complaints and "did not think there was anything unusual about" them. Exh. B to Pinkham Aff. 152 (document # 35–3). What was significant to the committee was Dr. Day's account of Dr. Tuli's interactions with hospital staff.[44]

Thus, having found that Dr. Tuli has demonstrated a sufficient likelihood that discriminatory animus was a motivating factor in the Committee's conclusion, the burden falls to the defendants to prove their affirmative defense that they "would have taken the same action in absence of the impermissible motivating factor." 42 U.S.C. § 2000e–5(g)(2)(B); *see also Cariglia*, 363 F.3d at 83–84 n. 2. In this case, that question boils down to whether Dr.

---

the years but did nothing to prevent him from presenting Dr. Tuli at the Committee meeting.

**43.** The evidence relating to any retaliatory motivation is inextricable from the evidence of discriminatory animus. Moreover, while Dr. Day may not have been aware of the HR department investigation or the April 2006 letter, it strains credulity that in such a small Department he was not aware of her accusations, her support for the other Indian female doctors, her efforts to prevent the residents from having a "cages and strippers" party, or that she had spoken to Hospital administrators about them. Dr. Day was unquestionably on notice of Dr. Soni's and Dr. Narayanan's complaints, as he must have been about Dr. Tuli's support of them. *See* Tuli Aff. ¶¶ 18, 31 (document # 36). He had been given counsel to address them.

Judge Collings found otherwise, based on plaintiff's counsel's letter in June of 2006, requesting that Dr. Tuli's "grievance and any formal investigation be held in abeyance." In fact, the June letter only asked that BWH forebear the investigation for the summer. In any event, Dr. Tuli's protected activity went beyond filing the April 2006 letter.

**44.** There is nothing in the record to suggest that Dr. Whittemore was asked to address any of the patient complaints during his presentation at the December 2007 meeting. While Dr. Coblyn's letter to Dr. Tuli cited "concerns about issues of interpersonal communication and behavior" and included patients in the list, the overwhelming evidence is that the patient complaints were immaterial. Exh. L to Tuli Aff. (document # 36–13).

Whittemore's presentation at the December 2007 meeting constituted a sufficient antidote to Dr. Day's presentation, whether his presentation was sufficiently neutral to counter-balance Dr. Day's biased one.[45]

Two conclusions follow from the highly subjective nature of both Dr. Day's and Dr. Whittemore's presentations. Either one could conclude that Dr. Whittemore's presentation did not offset Dr. Day's, or, in the alternative, that the record was ambiguous.[46] While there is evidence to suggest that Dr. Tuli had difficult working relationships with some of her colleagues and hospital staff, no one put those complaints in context. Nothing in the record suggests the Dr. Whittemore provided the Committee with any information about the history of the relationship between Dr. Day and Dr. Tuli, including her accusations of discrimination, or the accusations of the other female physicians of Indian descent. Two members of the Committee have since stated that such information would have been important to them in coming to a decision.[47] Nor did Dr. Whittemore give a complete presentation as to Dr. Tuli's competence as a surgeon. His presentation seems to have been limited to confirming or disconfirming Dr. Day's allegations as to Dr. Tuli's interactions with staff. And, in doing so, it was not clear that Dr. Whittemore did much more than review Dr. Day's accounts. In other words, the December 2007 meeting hardly represented a de novo review.

Because BWH bears the burden of showing that it would have reached the same decision absent the discriminatory influence of Dr. Day, even ambiguity cuts in favor of Dr. Tuli. As such, I find that Dr. Tuli has shown a likelihood of succeeding on the merits.

### D. *Irreparable Harm*

■ The possibility of irreparable harm to the plaintiff is a prerequisite to the issuing of a preliminary injunction. *See Narragansett*, 934 F.2d at 6–7. The question before this Court is whether conditioning Dr. Tuli's recredentialing on obtaining an evaluation at PHS and following the recommendations, if any, would cause Dr. Tuli irreparable harm.[48] Dr. Tuli ar-

**45.** "Where a neutral decisionmaker takes independent action against an employee, that person's 'independent decision to take adverse action breaks the causal connection between [a] supervisor's retaliatory or discriminatory animus and the adverse action.'" *Zades v. Lowe's Home Ctrs., Inc.*, 446 F.Supp.2d 29, 40 (D.Mass.2006) (quoting *Mole*, 442 Mass. at 598, 814 N.E.2d 329). "However, this 'causal connection' in not broken where a decisionmaker acts on biased information without conducting his own independent investigation." *Id.* (citing, inter alia, *Cariglia*, 363 F.3d at 86–88, 87 n. 4).

**46.** The Court notes that Dr. Whittemore played an integral role in the events that transpired between the October 2007 and December 2007 meetings, the decision about how to deal with Dr. Day's presentation, and what should happen next.

**47.** At the deposition of Dr. Frerichs the following exchange took place: "Q: Do you think that it was possible for the credentials committee to make a fair decision regarding Dr. Tuli's privileges, on the basis of Dr. Day's statements and presentation, without knowing that Dr. Tuli had made multiple complaints about her treatment by Dr. Day, and Dr. Day's belief that one of his cases had been reported to the board because of Dr. Tuli? . . . A: If that was true then it would have been important information." Exh. C to Defs.' Opp. 99–101 (document # 49–6).

**48.** The precise language used by Dr. Coblyn in his letter of November 12, 2007, reads: "After discussion, the [Credentials Committee] recommended that you be reappointed for a four month period, and that during that four month period, you contact Physician Health Services (PHS) and obtain an evaluation and recommendations by them with respect to theses issues. . . . It is my expectation that [the Credentials Committee] will not recommend further reappointment unless it has

gues that absent an injunction, she would be required to report this condition to regulatory bodies, on insurance forms and licensing applications. As a result, she argues, she would suffer various irreparable injuries, including difficulty in applying for other jobs, increased insurance premiums, and reputational injury that would handicap her in competing for research funding. Moreover, Dr. Tuli argues that the requirement that she consult with a psychiatrist and disclose certain information to the Committee would constitute an invasion of privacy.

For its part, BWH asserts that the Committee's referral of Dr. Tuli to PHS is not a disciplinary event and is not reportable to the Board of Registration in Medicine; it is also not something that would become a part of a physician's official record as maintained by BWH. Moreover, BWH argues that Dr. Tuli would only be required to disclose limited information to the Committee, tempering any privacy concerns.

Massachusetts would not consider a referral to PHS a "disciplinary action" in this situation since the referral did not arise out of the filing of a complaint. *See* 243 Mass.Code Regs. 3.02 (defining "disciplinary action" as, inter alia, "a course of education, training, counseling, or monitoring, only if such course *arose out of the filing of a complaint*") (emphasis added). However, while Massachusetts may not consider the conditioning of her credentials upon visiting PHS to be disciplinary in nature, its licensing application does ask if an applicant's medical privileges have ever

been subject to probationary conditions. (document # 65–9).

Dr. Tuli has also submitted licensing forms from all 50 states, many of which would seem to require disclosure of the Committee's conditional extension of Dr. Tuli's credentials. For example, Colorado asks: "Have you ever had any involuntary limitation or probationary status on or reduction, nonrenewal, denial, revocation or suspension of hospital or healthcare facility privileges?" (Document # 65–7). Iowa asks if privileges have been subject to "probationary conditions." (Document # 65–9). South Dakota asks whether clinical privileges have ever been "conditioned" by a peer review organization. (document # 65–12). If in the future Dr. Tuli were to answer "no" to any of these questions, she would clearly do so at her own peril. And having to answer "yes" to any of these questions would certainly cause harm to Dr. Tuli of a type courts are ill-equipped to remedy after the fact.

Moreover, the invasion of privacy involved in complying with the Committee's recommendation would not be insignificant. Dr. Tuli would be required to sign a release so as to allow PHS to advise members of the Committee that she has gone to PHS and that has complied with any recommendations.[49] To be sure, all doctors in Massachusetts are required to consent to such evaluations as a condition of practicing. Under 243 Mass.Code. Regs. 3.05(3)(j), BWH, "pursuant to its by-laws or by agreement with the licensee, will require the licensee to undergo a mental or physical examination, if requested by ... the credentials committee ...."[50]

received the recommendations from PHS along with an acknowledgment form you that you intend to comply with these recommendations." Exh. L to Tuli Aff. (document # 36–13).

49. No matter the exact nature of the initial PHS evaluation, it would most certainly implicate important privacy concerns.

50. Dr. Tuli has also consented to such an exam as part of her employment contract.

But where the Committee's request is motivated by discriminatory or retaliatory animus, the force of these requirements is lessened. Indeed, the invasion of privacy is more acute where a psychiatric or medical evaluation is used as a tool of harassment or discrimination. *See Appel v. Spiridon,* 463 F.Supp.2d 255, 266 (D.Conn. 2006); *cf. Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

Thus, I conclude that Dr. Tuli would suffer irreparable harm absent an injunction from this Court.

### E. *Balancing the Burdens*

■ The condition placed on Dr. Tuli's privileges to practice at BWH is no doubt a significant burden. Of course, imposing such conditions is properly within the sphere of the Credentials Committee's authority. However, where, as here, the condition is likely the result of a discriminatory decisionmaking process the Court will not discount the burden imposed on the plaintiff.

That said, the Court is careful to not unduly minimize the burden on BWH. As Dr. Whittemore states in his affidavit to this Court, the Hospital's "ability to confirm the appropriate behavior and health of the medical professionals who are providing care at the BWH is critical to its ability to assure optimal patient care and is required by state and federal regulation." Exh. C to Defs.' Opp. ¶ 47 (document # 49–6). Credentials Committees

should be free to make such determinations with minimal outside intervention from courts. The Court discuses the public policy implications at greater length below; however, it is worth noting here that granting of an injunction would not prevent BWH from reconvening the Credentials Committee tomorrow, ensuring that all potential for discriminatory bias has been eliminated, and revisiting the issues of Dr. Tuli's credentialing afresh. Given these facts, the burdens on Dr. Tuli and BWH are in equipoise.

### F. *Public Interest*

■ The Court is mindful that the relief Dr. Tuli seeks implicates very serious matters of public policy, namely the safety and well-being of patients in the Massachusetts health care system. It is not the intention of this Court to substitute its own judgment for that of the Credentials Committee. To do so would directly contravene important public policy concerns. *Cf. Woodbury v. McKinnon,* 447 F.2d 839, 846 (5th Cir.1971) (courts should give great deference to the decisions of hospitals' governing bodies concerning the granting of privileges because courts lack medical expertise). The public unquestionably has an important interest in maintaining the integrity of the confidential credentialing process. To this end, Massachusetts has taken steps to ensure that doctors are required to submit to mental and/or physical exams upon the request of a credentials committee. *See* 243 Mass.Code. Regs. 3.05(3)(j).

On the other hand, granting discriminatory actors impunity to use their sway in the credentialing process for purposes of harassment equally contravenes the public interest.[51] This is particularly the case

---

**51.** This conclusion is reinforced by Act ("HCQIA"), 42 U.S.C. §§ 11101–11152. damages for actions taken by peer review Committee. *See* 42 U.S.C. § 11111(a)(1). exempts

here: No serious concerns about patient safety have been raised.[52] When asked at the motion hearing about whether Dr. Tuli posed a danger to patients, BWH's counsel responded: "With regard to the quality of care that she provides, the hospital agrees that she is an excellent surgeon; however, based on the recent evidence that interpersonal communication, interpersonal issues can affect patient care, that is a part of the hospital's concern."[53] Prelim. Inj. Hr'g Tr. 29:17–22. Were there any concerns about patient safety, this would be a different case.

Granting the injunctive relief Dr. Tuli seeks would merely prevent BWH from conditioning Dr. Tuli's recredentialing on her visiting PHS *on the basis of Dr. Day's and Dr. Whittemore's presentations at the October 2007 and December 2007 meetings.* Nothing would prevent BWH from reconvening the Committee and considering Dr. Tuli's credentials afresh. *Cf. Cohen v. Cook County,* 677 F.Supp. 547, 553 (N.D.Ill.1988) (granting preliminary injunction requiring hospital to process doctor's application). Thus, while the public's interest in ensuring the safety of patients is significant indeed, the particular facts of this case limit the extent to which that interest is implicated here. As such, I conclude that public policy considerations, while heightening the level of scrutiny required, do not preclude the Court from issuing the narrowly tailored injunction Dr. Tuli seeks.

---

from the prohibition damages for the Health Care Quality Improvement The HCQIA prohibits the awarding of organs such as the Credentials However, the statute expressly civil rights claims. *Id.*

**52.** The Court certainly acknowledges, however, that communication skills and the ability to maintain positive interpersonal relationships are important factors in overall patient care and safety.

## IV. *CONCLUSION*

In light of the foregoing analysis, I conclude that Dr. Tuli has shown a sufficient likelihood of success on the merits and that the remaining preliminary injunction factors, taken as a whole, weigh in favor of issuing an injunction. Thus, Plaintiff's Motion for Preliminary Injunction (document # 32) is **GRANTED.** As such, BWH is enjoined from conditioning Dr. Tuli's credentials on her visiting PHS, but only insofar as any such condition is based on the presentations of Drs. Day and Whittemore in October and December 2007, respectively.

**SO ORDERED.**

---

**53.** It should be noted that Dr. Tuli's privileges at Faulkner Hospital were renewed on October 19, 2007, for another two years. Exh. M to Tuli Aff. (document # 36–14). Also, in November 2007, Dr. Tuli was asked to operate on a senior member of the Partners Healthcare administration and "very close personal friend" of BWH's president. *Id.* at ¶ 82.