Jean C. ALLARD, Plaintiff,

v.

CITIZENS BANK and Dennis Wyatt, Defendants.

Civil Action No. 07–12001–JLT.

United States District Court, D. Massachusetts.

April 9, 2009.

Carla J. Eaton, Lynn A. Kappelman, Seyfarth Shaw, LLP, Boston, MA, for Defendants.

Anne Glennon, Wendy A. Kaplan, Law Office of Wendy A. Kaplan, Boston, MA, for Plaintiff.

## MEMORANDUM

TAURO, District Judge.

### I. *Introduction*

Plaintiff Jean C. Allard alleges that Defendant Dennis Wyatt ("Mr. Wyatt") subjected her to harassment, discrimination, and retaliation while they were employed by Citizens Bank ("Citizens"). Plaintiff brings state and federal claims for violation of (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; and (2) the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B. Citizens brings a counterclaim for money had and received. Presently at issue is Defendants' *Motion for Summary Judgment* ("Motion") on all claims. For the following reasons, Defendants' Motion is ALLOWED.

### II. *Background*

From 1998 until 2006, Plaintiff worked in various capacities for Citizens, most recently as Customer Development Program Coordinator and Assistant Vice President in the Business Banking Group of its Norwood, Massachusetts office ("the Norwood office"). Plaintiff's job involved sending written communications that the Business Banking Group distributed throughout New England for contest winners and performance-award winners.

On May 15, 2006, Mr. Wyatt began working in the Norwood office as Vice President, Director of Sales Strategy and Support for New England Business Banking, making him Plaintiff's direct supervisor. Mr. Wyatt was two levels of management beneath Executive Vice President Hal Tovin and one level beneath Senior Vice President Anthony Nuzzo. In the summer of 2006, Mr. Tovin began drafting plans to consolidate the communications divisions of the three departments under his control, including Business Banking, into one group. When two vacancies arose in Business Banking early in Mr. Wyatt's tenure, Mr. Nuzzo instructed him not to fill the vacancies due to the departmental overhaul. As a result of this ongoing restructuring, Citizens had transferred a significant portion of Plaintiff's job responsibilities to its New England Communications Group by September 2006.

Soon after Mr. Wyatt's arrival, a conflict developed between Mr. Wyatt and Plaintiff, beginning in June 2006. The subject of the initial conflict was Mr. Wyatt's decision to revoke permission for Plaintiff to work in Citizens' Rhode Island office one day each week. On July 11, 2006, Plaintiff complained to Citizens' Human Resources Department about Mr. Wyatt, specifically targeting his abrupt and abrasive demeanor. On August 3, 2006, Plaintiff met with Bruce Nichols and Kathy Schoeffler of Human Resources, reiterating her complaints about Mr. Wyatt's management style and also mentioning that Mr. Wyatt "constantly 'adjusts' [himself] in meetings and [that she] finds it disgusting."[1] Plaintiff again summarized these complaints in an email

---

1. Nichols Aff. Ex. 15, Allard email, Sept. 19, 2006; Pl.'s Resp. Defs.' Statement of Facts Ex. 18, Nichols Notes: Meeting with Jean Allard, Aug. 3, 2006.

to Mr. Nichols and Ms. Schoeffler on September 19, 2006.

On October 4, 2006, Mr. Wyatt and Mr. Nichols presented to Mr. Nuzzo their own plan to reorganize the departments, which retained Plaintiff's position in the new system. Mr. Nuzzo, however, advised them to halt their plans in light of Mr. Tovin's anticipated restructuring, which would override their design. Later that day, Mr. Wyatt and Mr. Nichols met with members of the Sales Strategy and Support team individually to discuss job performance and the restructuring. During the meeting with Plaintiff, Mr. Wyatt pointed out deficiencies in Plaintiff's work but ultimately reassured her that Citizens was not planning to eliminate her position.

The following day, on October 5, 2006, Mr. Tovin, Mr. Nuzzo, Mr. Wyatt, Mr. Nichols, and Ms. Schoeffler all met in Mr. Tovin's office for a presentation of his reorganization plan. At the meeting, Mr. Tovin announced that his plan required eliminating Plaintiff's position. Defendants assert that, immediately following this disclosure, Ms. Schoeffler and Mr. Nuzzo informed Mr. Tovin of Plaintiff's complaints about Mr. Wyatt, but Mr. Tovin remained steadfast in his decision. Plaintiff alleges that Mr. Tovin had knowledge of Plaintiff's complaints before deciding to eliminate her position.

On October 16, 2006, Citizens informed Plaintiff of her termination, effective October 26, 2006. Citizens offered Plaintiff a severance agreement, which would provide Plaintiff with her salary of $65,560.22 annualized for six months and other benefits in exchange for a release of all her claims. Plaintiff never signed the agreement, but, due to an internal miscommunication, Citizens sent Plaintiff payments totaling $23,954.69 before noticing the mistake. Plaintiff cashed the checks and refused to repay Citizens.

## III. *Discussion*

### A. *Summary Judgment Standard*

A court may grant summary judgment when the moving party has shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2] The opposing party has the burden of production to "set forth specific facts showing that there is a genuine issue for trial."[3] The court must examine the facts in a light most favorable to the nonmoving party and resolve any reasonable inference in that party's favor.[4] "Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions, and affidavits to demonstrate either the existence or absence of an issue of fact."[5]

### B. *Sex Discrimination*

Plaintiff first alleges that Defendants subjected her to disparate treatment because of her gender in violation of 42 U.S.C. § 2000e and Mass. Gen. Laws ch. 151B. Discovery has revealed, however, that Plaintiff's sole claim of favoritism in her numerous reports to Human Resources arose with respect to another female employee.[6] In fact, seven out of the

---

**2.** Fed.R.Civ.P. 56(c).

**3.** *Id.* 56(e).

**4.** *Dasey v. Anderson,* 304 F.3d 148, 153 (1st Cir.2002).

**5.** *Magee v. United States,* 121 F.3d 1, 3 (1st Cir.1997).

**6.** Nichols Notes: Meeting with Jean Allard, Aug. 3, 2006.

eight individuals under Mr. Wyatt's supervision were women.[7] Regardless, Plaintiff did not pursue this claim in her Opposition to Defendants' Motion for Summary Judgment, and, therefore, Defendants' Motion is ALLOWED WITHOUT OPPOSITION as to Plaintiff's sex-discrimination claim.

## C. *Hostile Work Environment*

 Both federal law and state law recognize sex-discrimination claims when an employee must endure a hostile work environment as a result of sexual harassment by coworkers.[8] Sexual harassment occurs when "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... [have] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."[9] The alleged conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[10] This standard contains both a subjective and an objective component. First, the plaintiff must demonstrate that she actually perceived the environment to be hostile or abusive as a result of the defendant's conduct.[11] Second, the plain-

tiff must show that the alleged conduct was sufficiently severe or pervasive that a reasonable person would perceive the environment to be hostile or abusive.[12] In making this determination, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," but "no single factor is required."[13] This analysis "necessarily entail[s] a fact-specific assessment of all the attendant circumstances."[14]

 Here, Plaintiff's complaints to Human Resources initially centered on professional disagreements with her managers. Prior to Mr. Wyatt's arrival at Citizens, Plaintiff complained to Human Resources about the "hostile working environment" created by a disagreement with another supervisor over a recent performance evaluation.[15] Shortly after Mr. Wyatt's arrival, when Mr. Wyatt requested that Plaintiff work from Monday through Friday in the Norwood office, Plaintiff criticized Mr. Wyatt's "tendency to be abrupt and rude" in a report to Human Re-

---

**7.** *See* Defs.' Statement of Facts ¶ 8; Pl.'s Resp. Defs.' Statement of Facts ¶ 8.

**8.** *See* 29 C.F.R. § 1604.11 (2009); Mass. Gen. Laws ch. 151B, § 1(18) (West 2009). Because neither Plaintiff nor Defendants highlight any meaningful distinction between the state and federal law at issue, this court will analyze Plaintiff's claims concurrently through the lens of Title VII. *See Billings v. Town of Grafton*, 515 F.3d 39, 47 n. 6 (1st Cir.2008).

**9.** 29 C.F.R. § 1604.11.

**10.** *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (citations and internal quotation omitted).

**11.** *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *College–Town v. Mass. Com'n Against Discrimination*, 400 Mass. 156, 508 N.E.2d 587, 591 (1987).

**12.** *See Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *College–Town*, 508 N.E.2d at 591.

**13.** *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

**14.** *Billings*, 515 F.3d at 48 (quoting *Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 81 (2001)).

**15.** *See* Nichols Aff. Ex. 8, Allard email, Nov. 5, 2002.

sources.[16] Then, while reiterating her concerns about Mr. Wyatt's management style to Human Resources in August 2006, Plaintiff also remarked that Mr. Wyatt "adjusts" himself while in department meetings and that she found it offensive.[17] Plaintiff's sexual harassment claim rests entirely on the latter events.

In a conspicuous departure from the language used in her reports to Human Resources, Plaintiff adopts the term "fondling" in the Complaint to describe Mr. Wyatt's alleged behavior.[18] Plaintiff also refers to "Wyatt's habitual masturbation in her presence[ ] and in the presence of other employees." [19] The record, however, offers no support for this significant change in terminology. In her communications with Human Resources, Plaintiff repeatedly used the term "adjusting" to describe Mr. Wyatt's behavior, a complaint that cropped up in August amidst a long list of criticisms concerning Mr. Wyatt's abrasive management style.[20] Plaintiff never described the act as sexual in nature or involving any element of self-gratification.[21] She did not indicate to Human Resources that she perceived the act to be a sexual proposal or even that Mr. Wyatt

was conscious of this behavior. Additionally, Plaintiff never complained that Mr. Wyatt made any explicit or implicit sexual comments towards her, which might have offered some evidence of harassment. At her deposition, Plaintiff did not refute, modify, or add to her earlier characterizations of Mr. Wyatt's conduct in her reports to Human Resources.[22] In fact, Plaintiff simply reiterated that Mr. Wyatt touched the groin area of his pants while in meetings.[23]

Plaintiff also did not report ever feeling physically threatened. In fact, Plaintiff never even suggested that she thought Mr. Wyatt's conduct was directed towards her.[24] To establish that Mr. Wyatt's conduct unreasonably interfered with her work, Plaintiff states that she suffered from bouts of "uncontrollable diarrhea" during the same time frame.[25] As support, Plaintiff submits a statement by her treating physician attributing "several medical problems" to "stress [Plaintiff] is under at work." [26] This single, generalized statement does not establish a causal relationship between Mr. Wyatt's alleged habit of "adjusting" himself at meetings and Plaintiff's occasional diarrhea.

---

**16.** Pl.'s Resp. Defs.' Statement of Facts ¶ 17.

**17.** *Id.* ¶ 21; Nichols Notes: Meeting with Jean Allard, Aug. 3, 2006; Allard email, Sept. 19, 2006.

**18.** *See* Compl. ¶ 22, 24, 26.

**19.** *Id.* ¶ 26.

**20.** *Id.* ¶ 21; Nichols Notes: Meeting with Jean Allard, Aug. 3, 2006; Allard email, Sept. 19, 2006. On one occasion, Plaintiff also referred to the conduct as "physical self-touching." Pl.'s Resp. Defs.' Statement of Facts Ex. 9, Allard email, Aug. 2, 2006.

**21.** While the conduct "need not be motivated by sexual desire," Title VII requires the conduct to be "of a sexual nature." *Billings*, 515

F.3d at 51 (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. 998).

**22.** *See* Pl. Dep. 151:16–20, Apr. 29, 2008.

**23.** *See id.*

**24.** *See Fontanez–Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 57 (1st Cir.2006) (emphasizing that the defendant's crude remarks did not single out the plaintiff and were "often directed to many employees in the area or described [the defendant's] own conduct").

**25.** Pl.'s Resp. Defs.' Statement of Facts ¶ 18.

**26.** *Id.* Ex. 19, Note from Doctor Thomas L. Green, Oct. 5, 2006.

Hostile-work-environment claims also require consideration of the frequency or "pervasiveness" of the alleged conduct. Here, too, Plaintiff's claim falls short. In her Complaint and throughout discovery, Plaintiff did not attempt to quantify the instances of alleged misconduct. Instead, Plaintiff reported that the conduct took place once in front of her desk and "constantly" during the course of department meetings, without giving any indication of the number of meetings this statement described.[27]

Even assuming that Plaintiff subjectively perceived the conduct as abusive, this court holds that a reasonable person could not find Mr. Wyatt's alleged conduct sufficiently severe or pervasive to create a hostile or abusive working environment. Mr. Wyatt's habit of "adjusting" himself, uncoupled with any other allegations of misconduct, is not the type of inherently sexual behavior that creates an actionable claim under either state or federal law. Likewise, Plaintiff only points to a few instances of the behavior occurring over a five month span, which hardly makes the conduct pervasive.

Plaintiff relies on the First Circuit's decision in *Billings v. Town of Grafton*[28] as the primary support for her sexual-harassment claim. But *Billings* is clearly distin-guishable from the present case. Examining the facts in a light most favorable to the plaintiff, the First Circuit determined that "the evidence depict[ed] a supervisor who regularly stared at [the plaintiff's] breasts for much of the two and a half years they worked together."[29] Unlike *Billings*, Plaintiff does not indicate how often the conduct occurred, nor does she allege that it was directed toward her. Additionally, while "a man's repeated staring at a woman's breasts [cannot] be ordinarily understood as anything other than sexual,"[30] a man's habit of adjusting the groin area of his pants is not an inherently sexual act. The record before the First Circuit in *Billings* also contained "competing conclusions about the frequency and intensity of [the defendant's] alleged conduct,"[31] whereas here no such disagreement exists.[32] Finally, in *Billings* other women noticed and were offended by the defendant's conduct, thus bolstering the plaintiff's claim.[33] Here, Plaintiff reported that Mr. Wyatt's behavior primarily occurred at department meetings. But, when Mr. Nichols from Human Resources inquired about Mr. Wyatt's behavior to three other women in the department, none corroborated Plaintiff's statements.[34]

The conduct alleged in this case more closely approximates the conduct at issue in Title VII claims dismissed by the First

27. *See* Nichols Notes: Meeting with Jean Allard, Aug. 3, 2006; Pl.'s Resp. Defs.' Statement of Facts ¶ 18.

28. 515 F.3d 39 (1st Cir.2008).

29. *Id.* at 50.

30. *Id.* at 51.

31. *Id.* at 50.

32. Although Mr. Wyatt denies that he ever "adjusted" himself in Plaintiff's presence, this court, viewing the facts in a light most favorable to Plaintiff, will assume that he did. The Parties' fundamental disagreement revolves around the issue of whether such conduct constitutes sexual harassment.

33. *Id.* at 50–51 (quoting *Hernandez–Loring v. Universidad Metropolitana*, 233 F.3d 49, 55 n. 4 (1st Cir.2000)) ("Evidence of the harassment of third parties can help to prove a legally cognizable claim of a hostile environment.").

34. *See* Pl.'s Resp. Defs.' Statement of Facts Ex. 18, Nichols Notes: Meeting with Heather Dawood, Aug. 8, 2006; *id.*, Meeting with Karen Crissy, Aug. 8, 2006; *id.*, Meeting with Donna Leduc, Aug. 15, 2006.

Circuit.[35] Although hostile-work-environment claims are often factually driven, summary judgment remains "an appropriate vehicle for policing the baseline for [such] claims."[36] Assuming that public masturbation would support a hostile-work-environment claim,[37] Plaintiff does not offer any such evidence and, instead, asserts only that Mr. Wyatt adjusted the groin area of his pants while in her presence. The Supreme Court has been careful to avoid turning Title VII into a "general civility code."[38] Although perhaps unprofessional, Mr. Wyatt's alleged habit of "adjusting" himself in public was not, as a matter of law, so severe or pervasive as to alter the conditions of Plaintiff's employment and create a hostile work environment. Because Plaintiff has not raised a genuine issue of material fact under either federal or state law for hostile work environment sexual harassment, Defendants' Motion is ALLOWED with respect to Count I.

### D. *Retaliation*

▇▇▇ Plaintiff also asserts that Defendants unlawfully retaliated against her. Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made unlawful ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pursuant to the statute.[39] To establish a retaliation claim, Plaintiff must show that a reasonable person could find the alleged retaliatory conduct materially adverse, meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[40] The relative burdens of proof in a retaliation claim are governed by the *McDonnell Douglas* framework.[41] Plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in a protected activity; (2) she was discharged; and (3) there was a causal relationship between the discharge and the

35. *See, e.g., Fontanez–Nunez,* 447 F.3d at 57 (not sexual harassment where the defendant made "continued use of objectionable language and vulgar remarks"); *Pomales v. Celulares Telefonica, Inc.,* 447 F.3d 79, 83 (1st Cir.2006) (not sexual harassment where the defendant grabbed his crotch and told plaintiff, "[i]t would be great to come with you"); *Morgan v. Mass. Gen. Hosp.,* 901 F.2d 186, 192–93 (1st Cir.1990) (not sexual harassment where the defendant engaged in unwanted physical contact with the plaintiff and looked at the plaintiff's genitals in restroom).

36. *Billings,* 515 F.3d at 50 (quoting *Pomales,* 447 F.3d at 83).

37. Plaintiff cites two cases outside of this circuit involving sexual harassment claims premised on a man's touching his own genitals in the presence of coworkers. Both are inapposite. In *Sutton v. Kansas Dep't of Health & Env't,* for instance, the plaintiff reported seeing the defendant "inappropriately fondling his genital area" and "grop[ing] his genitals" while also keeping a package of

Viagra in plain sight, all of which was confirmed by five other female employees. No. 92,783, 2005 WL 638126, at *1 (Kan.Ct.App. Mar. 18, 2005). Similarly, in *Breeding v. Gallagher,* the plaintiff alleged that the defendant "fondled his genitals in front of her and used lewd and sexually inappropriate language." 164 F.3d 1151, 1159 (8th Cir.1999). Not only is this conduct more overtly sexual than merely "adjusting" oneself in another's presence, but it also occurred "continuous[ly]" during the plaintiff's employment and was corroborated by other employees. *See id.*

38. *Oncale,* 523 U.S. at 80, 118 S.Ct. 998.

39. 42 U.S.C.A. § 2000e–3(a) (West 2009).

40. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation omitted).

41. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

protected activity.[42] Because Plaintiff's burden of setting forth a prima facie case "is not an onerous one," close temporal proximity between a protected activity and a subsequent discharge may give rise to an inference of causation.[43] An inference of causation is only appropriate, however, when Plaintiff has presented evidence that the decisionmaker was aware of Plaintiff's protected activity.[44]

■ If Plaintiff establishes a prima facie case, a presumption of retaliation arises, and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.[45] The employer can overcome the presumption of retaliation by presenting a legitimate reason for the discharge, which then shifts the burden back to Plaintiff to show that the employer's stated reason was a pretext.[46] To demonstrate pretext, Plaintiff must introduce either direct or circumstantial evidence of discriminatory animus.[47] Circumstantial evidence includes "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[48]

■ A separate standard, independent of the *McDonnell Douglas* framework, governs cases involving the influence of a biased third party on the decisionmaker.[49] In *Cariglia v. Hertz Equipment Rental Corp.*, the First Circuit held that "corporate liability can attach when neutral decisionmakers rely on information that is manipulated by another employee who harbors illegitimate animus."[50] The First Circuit has not yet applied *Cariglia* to a Title VII claim, but considering its approval of *Cariglia* in other contexts,[51] as well as Plaintiff's choice to bring retaliation claims under both state and federal law, this court will examine the claims concurrently under the *Cariglia* standard.[52] *Cariglia* imposes liability where:

**42.** *Pomales*, 447 F.3d at 84 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–05, 93 S.Ct. 1817).

**43.** *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 858 (1st Cir.2008).

**44.** *See Pomales*, 447 F.3d at 85 ("[T]here must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action.").

**45.** *See Billings*, 515 F.3d at 55.

**46.** *Id.* (quoting *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 336 (1st Cir.2005)).

**47.** *See DeCaire v. Mukasey*, 530 F.3d 1, 15 (1st Cir.2008).

**48.** *Billings*, 515 F.3d at 55–56 (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir.1998)).

**49.** *See Tuli v. Brigham & Women's Hosp., Inc.*, 566 F.Supp.2d 32, 50 (D.Mass.2008) (noting that "*Cariglia* and its progeny provide a far more appropriate framework for analyzing the facts of this case," which focus on the motivations of a doctor who disparaged the plaintiff in a presentation to the hospital's Credentials Committee).

**50.** 363 F.3d 77, 79 (1st Cir.2004).

**51.** *See Davila v. Corporacion de P.R. para la Difusion Publica*, 498 F.3d 9, 17 n. 3 (1st Cir.2007) (approving *Cariglia* in the context of an ADEA case).

**52.** *See Tuli*, 566 F.Supp.2d at 51 n. 34 (examining the plaintiff's state and federal retaliation claims under the *Cariglia* standard for identical reasons). Viewing the claims concurrently through the lens of First Circuit precedent does not disadvantage Plaintiff, despite her failure to distinguish state and federal law, because Massachusetts case law arguably creates an even higher bar for plaintiffs to meet. *See Mole v. Univ. of Mass.*, 442 Mass. 582, 814 N.E.2d 329, 343 (2004) (holding that liability attaches if the decisionmaker "merely 'rubber stamps' the recommendation

(a) a discriminating subordinate (b) causes the firing of a plaintiff by (i) intentionally giving false information to and (ii) withholding accurate information from the decisionmaker, (c) the decisionmaker's decision is significantly based on these very inaccuracies, and (d) the plaintiff has been given no opportunity to provide contrary information.[53]

### 1. Plaintiff's Discharge

 Plaintiff bases her retaliation claim primarily on the fact that Citizens terminated her employment on October 26, 2006, slightly more than three months after she began filing complaints to Human Resources about Mr. Wyatt's conduct. Plaintiff has easily satisfied the first two elements that comprise a prima facie case of retaliation. Plaintiff's complaints about Mr. Wyatt constitute a protected activity, and Plaintiff was ultimately discharged. An issue arises with respect to the third element, however, which requires a causal connection between the protected activity and the discharge. Plaintiff suggests that close temporal proximity between Plaintiff's complaints and her termination establishes this connection. While close temporal proximity between a protected activity and a subsequent discharge "*may* give rise to a suggestion of retaliation, [ ] that suggestion is not necessarily conclusive." [54] Before a court may infer causation from temporal proximity, Plaintiff must present evidence that the decisionmaker was aware of the protected activity.[55]

Defendants maintain that Mr. Tovin was unaware of Plaintiff's complaints when he decided to eliminate her position, thus making the proximity of the complaints to the ultimate discharge inconsequential. At his deposition, Mr. Tovin testified that he learned of Plaintiff's complaints some time after he decided to discharge her, but he could not recall exactly when.[56] The four other participants at the October 5 meeting—Mr. Nichols, Mr. Wyatt, Mr. Nuzzo, and Ms. Schoeffler—all testified in their depositions that Mr. Tovin was notified about Plaintiff's complaints immediately *after* he announced that his restructuring plan involved the elimination of Plaintiff's position.[57] In fact, Mr. Nichols and Ms. Schoeffler stated that they were concerned that Plaintiff might perceive the action as retaliatory,[58] providing a clear reason for them to divulge the information to Mr. Tovin at that time.

Plaintiff has not presented any evidence to contradict this testimony. Instead, Plaintiff argues that it is "simply incredible" that Mr. Nuzzo or Ms. Schoeffler did not previously discuss Plaintiff's complaints with Mr. Tovin during their regular interactions with him.[59] But a retaliation claim cannot survive a motion for summary judgment by relying on "tenuous insinuation" alone.[60] Plaintiff has not raised a genuine issue with respect to Mr. Tovin's

of the retaliating supervisor, or if the retaliating supervisor 'dupes' the decisionmaker into taking action, or otherwise controls the decisionmaker'').

**53.** *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1, 19 (1st Cir.2008).

**54.** *See Hodgens*, 144 F.3d at 168 (citation and internal quotation omitted).

**55.** *See Pomales*, 447 F.3d at 85 (affirming grant of summary judgment for the defendant where the plaintiff did not produce evidence that decisionmaker was aware of the protected activity).

**56.** Tovin Dep. 88:21–89:1, Aug. 7, 2008.

**57.** *See* Nichols Dep. 216:17–217:4, June 3, 2008; Wyatt Dep. 229:23–230:6, May 15, 2008; Nuzzo Dep. 77:20–78:8, 194:4–13, June 23, 2008; Schoeffler Dep. 216:15–219:21, June 5, 2008.

**58.** *See* Pl.'s Resp. Defs.' Statement of Facts P; Nichols Dep. 185:7–186:13; Schoeffler Dep. 216:15–219:8.

**59.** Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 17.

**60.** *Dennis*, 549 F.3d at 858 (citation and internal quotation omitted).

awareness of Plaintiff's complaints when he made the decision to terminate her and, thus, fails to establish a prima facie case of retaliation.[61]

■ Plaintiff argues alternatively, citing *Cariglia*, that Mr. Wyatt manipulated Mr. Tovin's decision to discharge her. Plaintiff's argument hinges on the following exchange between Mr. Wyatt and Mr. Tovin at the October 5 meeting, as described by Mr. Wyatt:

> Hal [Tovin] asked me: Dennis, I've transferred all of—a majority of Jean's responsibility to the centralized group. What do you have her doing? ... I said, Well, I got her doing some ... of this, some of that as things come up, busy [ ] work. So we really don't have her in a role. And I said, that's accurate. But ... she's working on the team.[62]

Plaintiff suggests that this conversation illustrates Mr. Wyatt's disdain for Plaintiff after learning of her complaints in September and caused Mr. Tovin to discharge her.

*Cariglia* first requires Plaintiff to demonstrate that a supervisor (or another

third party) harbored illegitimate animus against her.[63] Even assuming that Plaintiff meets this requirement, she cannot satisfy the second and third elements of the test. *Cariglia*'s second element requires a showing that the supervisor intentionally gave false information to, and withheld accurate information from, the decisionmaker.[64] While Plaintiff disagrees with Mr. Wyatt's characterization of her role as involving primarily "busy work," Plaintiff acknowledges that "a portion of her job had been transferred" as a result of the departmental overhaul initiated earlier in the year.[65] Given this admitted reduction in Plaintiff's regular responsibilities, a reasonable juror could not conclude from the evidence submitted that Mr. Wyatt intentionally gave false information to Mr. Tovin.[66]

*Cariglia* further requires Plaintiff to present evidence that the "decisionmaker's decision is significantly based on these very inaccuracies."[67] It is undisputed that Mr. Tovin was already in the midst of centralizing the communications functions of the three departments under his control when Citizens discharged Plaintiff.[68] The

---

**61.** This result accords with previous decisions in this circuit. *Compare Pomales*, 447 F.3d at 85 (granting summary judgment for the defendant where the plaintiff produced no evidence of decisionmaker's knowledge of her complaints) *with L'Etoile v. New England Finish Sys., Inc.*, No. 00390, 2008 WL 4104143, at *8 n. 15 (D.N.H. Aug. 29, 2008) (denying summary judgment for the defendant where there was evidence that two individuals, one of whom knew about the plaintiff's complaints, "both came to an agreement that work had slowed down and that [the plaintiff] was the next one," and company had practice of allowing those individuals to make collaborative layoff decisions (internal quotation omitted)).

**62.** Wyatt Dep. 231:17–232:2.

**63.** *See Cerqueira*, 520 F.3d at 19.

**64.** *See id.*

**65.** Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 17. There is, of course, some disagreement about the extent of the work that was transferred. Defendants assert that Mr. Tovin had already transferred "approximately 80%" of Plaintiff's responsibilities, *see* Defs.' Statement of Facts ¶ 15, but Plaintiff believes that this estimate is too high, *see* Pl.'s Resp. Defs.' Statement of Facts ¶ 15.

**66.** *Cf. Cariglia*, 363 F.3d at 82 (finding that supervisor reported to decisionmakers that the plaintiff had failed to complete an important assignment but supervisor excluded the reasons given by the plaintiff that would explain his behavior).

**67.** *Cerqueira*, 520 F.3d at 19.

**68.** *See* Pl.'s Resp. Defs.' Statement of Facts ¶ 14. Although Plaintiff argues that she was treated differently than other communications employees, she does not dispute the fact that

participants at the October 5 meeting agree that Mr. Tovin announced his decision to eliminate Plaintiff's position as part of this restructuring, and they reject the possibility that Mr. Wyatt influenced Mr. Tovin's decision.[69] Moreover, Mr. Tovin himself unequivocally states that "we centralized communications, and . . . her job was eliminated. It wasn't Jean Allard. It was the function [that] was eliminated."[70] Plaintiff presents no evidence to rebut this testimony and, therefore, cannot satisfy the *Cariglia* standard.[71]

### 2. *Other Alleged Instances of Retaliation*

■ In addition to her ultimate discharge, Plaintiff also alleges several other instances of retaliatory conduct. Plaintiff first claims that Mr. Wyatt excluded her from a conference call relevant to her position one day after her July 11 complaint and from a meeting one day after her August 3 complaint.[72] Assuming the truth of these allegations, Plaintiff cannot establish a prima facie case of retaliation. Principally, Plaintiff must offer some evidence that Mr. Wyatt knew about Plaintiff's complaints when he engaged in the retaliatory conduct.[73] Mr. Wyatt testified that he was "certain" he learned of this information in late September 2006, after Human Re-

sources completed its investigation,[74] and Plaintiff has not produced any evidence that would create a genuine issue as to this fact.

Second, Plaintiff argues that Mr. Tovin's decision to transfer some of her job responsibilities to Citizens' New England Communications Group constitutes retaliation, but Plaintiff herself testified that she learned about Mr. Tovin's reorganization plan in July, prior to her complaints of sexual harassment.[75] Additionally, the participants of the October 5 meeting all testified that Mr. Tovin first learned of Plaintiff's complaints at that time,[76] which precludes any reasonable inference that his planned reorganization was retaliatory.

■ Third, Plaintiff suggests that Citizens retaliated against her by converting its investigation of Plaintiff's complaints into an investigation of Plaintiff herself.[77] Plaintiff bases this argument on a meeting with Mr. Nichols and Mary–Ellen Healey of Human Resources on September 21, 2006 in which they discussed the results of their internal investigation into Plaintiff's complaints. At this meeting, Mr. Nichols and Ms. Healey also admonished Plaintiff for discussing her complaints with coworkers and confronted her about allegations by coworkers that Plaintiff publicized her

Mr. Tovin was in the process of centralizing the communications departments in 2006. *See id.*

**69.** *See* Nichols Dep. 215:20–216:4; Wyatt Dep. 13:10–22; Nuzzo Dep. 98:18–99:12; Schoeffler Dep. 216:18–20:22; Tovin Dep. 68:1–6, 70:22–71:7; Nichols Aff. Ex. 19, Wyatt Note to File, Oct. 5, 2006.

**70.** Tovin Dep. 71:3–7.

**71.** *Cf. Tuli,* 566 F.Supp.2d at 51 n. 35 (holding that the plaintiff satisfied *Cariglia* standard where witnesses testified that the false information "played a significant role in the [decisionmaking body's] ultimate determination"); *Cariglia,* 363 F.3d at 79 (holding that the plaintiff satisfied standard after district

court found that the false information was a "pivotal consideration" in the discharge).

**72.** *See* Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 9.

**73.** *See Pomales,* 447 F.3d at 85.

**74.** Wyatt Dep. 61:15–20.

**75.** *See* Pl. Dep. 122:24–123:17.

**76.** *See* Nichols Dep. 216:17–217:4; Wyatt Dep. 229:23–230:6; Nuzzo Dep. 77:20–78:8, 194:4–13; Schoeffler Dep. 216:15–219:21.

**77.** *See* Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 9.

intent to "kill" Mr. Wyatt's career.[78] Even accepting Plaintiff's position that she never made such statements, Human Resources' decision to confront her with these allegations does not constitute a materially adverse action that would dissuade a reasonable person from complaining in the future.[79]

Fourth, Plaintiff points to a department meeting on October 5, 2006 in which Mr. Wyatt requested that she not leave promptly at 5:00 p.m. every night and explained that many of her colleagues "worked exceptionally long hours" to complete their assignments.[80] In an email to Mr. Nichols later that day, Plaintiff stated that she "never left with work unfinished" and that "this is another way to retaliate against me because of my complaints."[81] Plaintiff does not specify whether this request was enforced, whether it actually caused her to work significantly longer shifts, or how her hours compared to her coworkers' before and after the meeting. Without more, this bare allegation cannot constitute a materially adverse action.[82]

Fifth, Plaintiff alleges two instances of retaliation that took place after her termination: (a) she was escorted out of the office in contravention of company poli-cy; and (b) Citizens filed a frivolous counterclaim against her. Plaintiff does not provide any details about when she was escorted out, how she was escorted out, or what exactly she means by the phrase "escorted me out" of the office.[83] Plaintiff also has not produced deposition testimony from coworkers or security guards who could, presumably, offer some evidentiary support for her allegations. Absent these critical details, Plaintiff's argument cannot survive summary judgment.[84] With respect to Defendants' Counterclaim, Plaintiff does not cite any First Circuit precedent holding that a frivolous counterclaim violates Title VII, but this court need not decide the issue given its conclusion that Defendants' Counterclaim is meritorious.[85]

Accordingly, Defendants' Motion is ALLOWED with respect to Count II of the Complaint, Plaintiff's retaliation claim.

### E. *Defendant Citizens Bank's Counterclaim*

Citizens brings a counterclaim against Plaintiff for money had and received. Massachusetts recognizes a common law action for money had and received where the defendant "received money ... which in equity and good conscience belongs to the plaintiff."[86] This

---

**78.** *See* Nichols Aff. Ex. 17, Nichols Notes, Oct. 5, 2006.

**79.** *Cf. Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 70–71, 126 S.Ct. 2405 (upholding jury verdict finding that the defendant took a materially adverse action by reassigning the plaintiff to a position that was "by all accounts more arduous and dirtier" and carried less prestige) (citation and internal quotation omitted).

**80.** Pl.'s Resp. Defs.' Statement of Facts Ex. 13, Nichols Notes: Meeting with Dennis Wyatt and Team, Oct. 4, 2006.

**81.** *Id.* Ex. 13, "Email from Jean received 10/5/2006."

**82.** *See Burlington N.,* 548 U.S. at 68, 126 S.Ct. 2405.

**83.** *See* Pl.'s Resp. Defs.' Statement of Facts ¶ 38; Pl. Dep. 183:9–12.

**84.** *See Magee,* 121 F.3d at 3 ("Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions, and affidavits to demonstrate either the existence or absence of an issue of fact.").

**85.** *See infra* Part III.E.

**86.** *Cookson Group plc v. Flynn,* 52 Mass.App. Ct. 909, 755 N.E.2d 763, 766 (2001).

action is appropriate when one party to a contract mistakenly overpays another.[87] After Citizens terminated Plaintiff's employment effective October 26, 2006, it offered Plaintiff a severance agreement that would provide Plaintiff with her salary of $65,560.22 annualized over six months, along with other benefits, in exchange for a release of all her claims.[88] Plaintiff never signed the agreement, but, due to an accounting error, Citizens began sending payments to Plaintiff anyway.[89] Plaintiff cashed the checks and refused to pay the $23,954.69 she received before Citizens noticed the error.[90] Plaintiff acknowledges that Citizens never represented to her that she would receive these payments even if she failed to sign the agreement.[91]

Plaintiff has not raised a genuine issue with respect to Citizens' intent, or lack thereof, to pay her pursuant to a severance agreement that she never signed. Accordingly, Defendant Citizens Bank's Motion for Summary Judgment on its Counterclaim is ALLOWED.

### IV. *Conclusion*

For the foregoing reasons, Defendants' *Motion for Summary Judgment* is ALLOWED. Defendant Citizens Bank is entitled to $23,954.69 plus interest on its Counterclaim. AN ORDER HAS ISSUED.

### ORDER OF JUDGMENT

After reviewing Parties' submissions, this court hereby orders the following:

1. Defendants' *Motion for Summary Judgment* [# 37] is ALLOWED with respect to all counts of Plaintiff's Complaint and Defendant's Counterclaim.

2. Judgment is hereby entered for Defendant Citizens Bank in the amount of $23,954.69 plus interest.

IT IS SO ORDERED.

---

**87.** *See id.* (affirming summary judgment for tenant who unintentionally overpaid landlord on residential lease); *Comm'r of Ins. v. Jankowski Ins. Agency LLC,* 61 Mass.App.Ct. 305, 809 N.E.2d 1084, 1086 (2004) (affirming summary judgment for insurance commissioner who sought the return of commissions paid to agents pursuant to policies that were later cancelled).

**88.** Nichols Aff. Ex. 20, Severance Agreement, Oct. 16, 2006.

**89.** *See* Pl. Dep. 189:1–193:19.

**90.** *See id.*

**91.** *See id.* 184:16–20.